# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 1999-CA-00291-SCT

*MARILYN SMITH HOLLADAY*

*v.*

*ROBERT LAWSON HOLLADAY*

| | |
|---|---|
| DATE OF JUDGMENT: | 04/10/1998 |
| TRIAL JUDGE: | HON. DENNIS M. BAKER |
| COURT FROM WHICH APPEALED: | SUNFLOWER COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | NANCY ALLEN WEGENER |
| ATTORNEYS FOR APPELLEE: | F. EWIN HENSON, III |
| | A. LEE ABRAHAM, JR. |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | REVERSED AND REMANDED - 08/24/2000 |
| MOTION FOR REHEARING FILED: | 9/6/2000; denied 2/15/2001 |
| MANDATE ISSUED: | 2/22/2001 |

**BEFORE PRATHER, C.J., MILLS AND COBB, JJ.**

**MILLS, JUSTICE, FOR THE COURT:**

¶1. After more than nine years of marriage, Marilyn "Susie" Smith Holladay filed a complaint for divorce in the Sunflower County Chancery Court. She alleged that her husband, attorney Robert Lawson Holladay, was guilty of habitual cruel and inhuman treatment which entitled her to a divorce, custody of their minor child, child support, equitable division of marital property, alimony and attorney's fees. Lawson denied the allegations and further denied that Susie was entitled to any relief sought. At the end of Susie's proof, Lawson moved to exclude the evidence and dismiss the case for failure to make a prima facie case of habitual cruel and inhuman treatment. An order dismissing the case with prejudice was entered by Special Chancellor Dennis M. Baker. Susie subsequently perfected her appeal to this Court, raising the following issues:

## ISSUES

**I. WHETHER THE TRIAL COURT ERRED IN FINDING DISCOVERY VIOLATIONS AND THEREBY EXCLUDING LAY AND EXPERT TESTIMONY.**

**II. WHETHER THE TRIAL COURT ERRED IN EXCLUDING HEARSAY STATEMENTS OF JENNIFER HOLLADAY.**

**III. WHETHER THE TRIAL COURT ERRED IN EXCLUDING PROOF OF AN ALLEGED VIOLENT INCIDENT BEFORE MARRIAGE.**

## IV. WHETHER THE TRIAL COURT ERRED IN DISMISSING THE COMPLAINT FOR DIVORCE.

### FACTS

¶2. Marilyn "Susie" Smith and Robert Lawson Holladay were married on May 2, 1987, in Leflore County, Mississippi. The couple had one child, Jennifer, who was nine years old when the instant complaint for divorce was filed on September 4, 1997. Susie had two sons by a previous marriage, Haley and Sam Easley. Lawson had one son, Rob, from a previous marriage. All three boys lived with Susie and Lawson at the beginning of the marriage. After a year of his mother's second marriage Haley became depressed and moved to his father's home until high school graduation, but he spent the summer of 1997 (immediately prior to the separation) at Susie and Lawson's home in Ruleville, Mississippi.

¶3. At trial Susie testified in detail about the direction of her marriage with Lawson. Her direct examination revealed that he began a course of verbal and physical abuse about three months after their marriage when Susie became pregnant with Jennifer. Lawson's drinking and violent outbursts caused Susie to leave home on three separate occasions. Susie attempted to avoid confrontations with Lawson out of fear, but a month before Jennifer was due, Lawson went into a rage when Susie asked him to attend an awards ceremony for his son Rob. While the record is unclear as to the cause, Susie's crying was followed by cramps and Jennifer's subsequent birth that day.

¶4. On one occasion in May of 1990, Jennifer was crying in the middle of the night due to an ear infection. To his displeasure, the crying awakened Lawson, and he physically shook Jennifer and tossed her back into her crib. Because Susie had never seen Lawson show any violence toward the children, growing fear caused her to leave home for approximately one week. Susie returned to Ruleville after Lawson agreed to see a marriage counselor and move into his father's residence. The parties subsequently signed an agreement to receive marital counseling. They remained separated for the next three months. A reconciliation followed after Lawson promised to improve his temper and conduct.

¶5. Marital relations improved until some time in 1993, when Lawson's verbal abuse began to recur. Lawson became angry over her spending habits toward Haley, and, in the middle of an argument he choked and spit on her. Susie responded by calling a mutual friend, Dudley Burke, who arrived at their home and remained there until Lawson appeared calm. On another occasion in 1993, Lawson threw a McCarty pottery bowl at Susie during an argument over money. Susie attempted to testify that Lawson's actions caused her to suffer from "anxiety attacks," but the trial court sustained Lawson's objection on grounds that it was an unqualified medical diagnosis. She did testify that Lawson's conduct made her very anxious, worried, and frightened.

¶6. In late October of 1994, an incident caused Susie to separate from Lawson a second time. The couple attended a Halloween party and consumed alcoholic beverages. Lawson passed out on a couch, and when he awakened, he grabbed Susie and pulled her across a coffee table. Susie testified that she was bruised in the process. Lawson denied the allegation, testifying that Susie was bruised because she fell down while they were dancing. Lawson then left Susie at the party and returned home where six-year-old Jennifer was being watched by a babysitter. Lawson took the babysitter home and left Jennifer alone in the house.

¶7. When Susie arrived at their residence with friends, Lawson refused to let her in the house. Jennifer was crying and asking for her mother. This standoff lasted throughout the night, and several of Lawson's law

partners called and asked that he allow Jennifer to leave. Susie spent the night at the house of a mutual friend and continued calling Lawson with requests for him to "release" his daughter. Susie testified that she could hear Jennifer crying during these calls. She finally called Lawson around 5:30 a.m., and he agreed let Susie see Jennifer. Susie testified that, "When he opened the door he had slept with her [Jennifer] in the bed with a T shirt and no underwear on."

¶8. Lawson objected that the incident had not been revealed in discovery. The trial court allowed the testimony concerning Lawson's lack of attire but struck the testimony "with respect to how he slept, where he slept and with whom he slept. The way he appeared when she saw him, she can tell it...." Susie then explained how she knew that Lawson had slept with Jennifer:

> I called all night long about every 30 minutes, all night long. I called to try and get him to let her out. He kept telling me-- Lawson told me, Jennifer is laying here trying to sleep. We are in bed sleeping. You keep calling; you keep waking her; you keep waking me up. Quit calling me, you (vile name). I knew she was in the bed with him because I could hear her and he stated that he was in the bed with her.

¶9. The trial court considered this explanation but let the earlier ruling stand. While Susie's attorney stated that she was not alleging sexual abuse, Susie testified to another incident when Lawson had been drinking heavily. On that occasion Lawson walked into the kitchen in front of Jennifer wearing only a T shirt. Jennifer was embarrassed and Susie testified that the conduct was inappropriate.

¶10. As a result of the Halloween night incident, Susie and Lawson separated, and she filed a complaint for divorce on November 28, 1994, but they were reconciled several months later, in June of 1995. Susie agreed to the reconciliation and dismissal of the complaint subject to three conditions: 1) Lawson's agreement to receive treatment at the Charter Behavioral Hospital; 2) Lawson's agreement to establish a $25,000 account, not to be spent unless another break-up occurred in the marriage so Susie could have some financial security to hire an attorney; and 3) Lawson's agreement to put the marital residence "in both their names." Lawson subsequently complied with these three conditions and again promised to stop his verbal and physical abuse.

¶11. Lawson temporarily kept his promises after the reconciliation, but instances of verbal and physical abuse began to recur. He called Susie names such as goddamned motherfucking bitch, whore, and slut. Lawson objected to Jennifer's attending Presbyterian Day School and consequently reacted with angry tirades of more verbal abuse. Susie testified that Jennifer reacted to these outbursts with fear. The instances escalated in the summer of 1997, prior to the final separation in September. On another occasion Lawson spit at Susie in front of Jennifer while calling her a vile name. During that summer Lawson's drinking escalated. His temper tantrums became more violent; he was physically abusive at times; he made vague threats. This behavior became virtually a daily occurrence during the summer of 1997.

¶12. Susie was employed part time in Lawson's law office during the marriage, and in 1996, she had $9,166.03 of net income. Susie paid Jennifer's babysitter from her salary. Susie also received $804 in interest generated by the deposit Lawson gave her as part of the 1995 reconciliation agreement. In March of 1997 Lawson demanded that Susie pay him an additional $2,300 as "her share" of his business taxes. When Susie offered to file separately and pay her own taxes rather than file jointly, Lawson became enraged and began a course of daily verbal harassment. During the summer of 1997 Lawson refused to pay for repairs to her vehicle, closed her bank account, took her checkbook, and began personally buying the groceries. He

required Susie to ask for money used to buy Jennifer's clothes, repeatedly called her vile names, and physically restrained her on two different occasions.

¶13. Susie testified that she began writing Lawson notes because she was afraid of him. She testified that the principal cause of the separation was the fear, the physical violence and the verbal abuse --- not money. In attempting to explain her fear of Lawson, Susie tried to introduce evidence of a violent incident which occurred shortly before the marriage. She proffered testimony of Lawson going into a violent rage and severely beating her so badly that she was unable to work for a week or "car-pool" her two sons. As a result of this incident the couple sought counseling. The trial court excluded this incident because it occurred before the marriage, and the trial court held that it was improperly being introduced as grounds for habitual cruelty and inhuman treatment.

¶14. During Susie's direct examination, her attorney asked about the effect of the marital relationship on Jennifer. Susie attempted to testify about Jennifer not wanting to be left alone with Lawson, but the trial court held this was inadmissible hearsay. Testimony revealed that Jennifer would physically pull and scratch Susie's arms in an attempt to have her present when she was around Lawson. The trial court restricted Susie's testimony that Jennifer had constant, severe stomach aches because of the tumultuous marriage. The record reflects that Jennifer was prescribed medicine for stomach ulcers during the Holladay marriage.

¶15. On Susie's cross-examination, Lawson introduced medical records of Frank T. Marascalco, M.D., which reflected that Susie was crying and under stress during an examination. While Susie testified that she had never been diagnosed with depression, Dr. Marascalco did prescribe Prozac and Xanax for anxiety attacks she suffered over confrontations with Lawson. Counsel for Lawson inferred that Susie was suffering from a mental illness through no fault of Lawson.

¶16. On October 27, 1997, prior to trial, Susie responded to Lawson's interrogatory No. 7, which asked the identity of any potential trial witness. Susie listed Dr. Camille Branton, Dr. Beth Tibbs, Louise Campbell, JoAnn Campbell, Judge John Burrel, Leonard Vincent, Becky and Bubba Tollison, Judy Koslow, Sam Easley, Haley Easley, Scott and Amy Smith, Judy Tranum and Ann Holladay. Susie's response to Lawson's interrogatory No. 8, which asked for the identity of any potential expert witnesses, listed Dr. Camille Branton and Dr. Beth Tibbs. Lawson's interrogatory No. 16 asked Susie to disclose specific actions, events and documents, together with the corresponding dates and witnesses, that supported her grounds for divorce. Susie's response detailed two pages of Lawson's alleged cruelty that "forced Susie to suffer emotional and mental anguish and stress and she states that she has had to consult a counselor for herself and for Jennifer."[1]

¶17. Susie supplemented her response to interrogatory No. 8 on December 1, 1997, with a summary of Dr. Branton's opinion, and on December 8, 1997, with Dr. Branton's report. During the trial on January 22, 1998, Susie was asked by her attorney if she had sought counseling for herself during the past summer. Lawson objected, and the trial court prevented Susie from mentioning any reference to Dr. Branton. Susie then proffered the testimony and stated that she had also consulted Dr. Michael Whelan, Dr. Jerry Harper and Lawson's former psychiatrist, Dr. Belavaqua.

¶18. The trial was continued from January 23, 1998, until March 30, 1998. On March 25, 1998, Susie supplemented her response to the expert interrogatory No. 8. With a report from Dr. Branton. Lawson filed a motion in limine to exclude the March 25th report and to exclude any testimony from Dr. Branton except on the issue of custody. The trial court heard oral arguments and granted the motion.

¶19. Susie next attempted to call corroborative witnesses on her alleged grounds for divorce, including Judy Koslow, Haley Easly, Scott Smith, Sam Easly, Ann Holladay, and Dr. Camile Branton. Judy Koslow, Susie's sister, took the witness stand first and testified about a telephone conversation with her sister when Jennifer was six weeks old. Koslow stated that Susie was "a bit overwhelmed" and that she could tell that Susie seemed to be very upset. The trial court excluded testimony concerning the phone conversation, deciding that, "She's going to psychoanalyze the circumstances... she's painting a picture and hanging it on the wall."

¶20. Koslow was allowed to testify about an incident that occurred after she arrived at the marital home to help with baby Jennifer. She was awakened by Lawson screaming vile names at Susie around six o'clock one morning. Lawson walked out of the bedroom, and when he reentered, Koslow heard a loud crash and ran into the master bedroom to find her sister crouched in the corner between the bed and the door to the bathroom. Koslow testified that Lawson had thrown a plate at Susie which shattered on the floor. Koslow tried to encourage Susie to pack her bags and leave after Lawson left the house.

¶21. Lawson's attorney promptly objected to all testimony relating to grounds for divorce which had not been specifically set forth in Susie's response to interrogatory No. 16. Susie argued that her response to interrogatory No. 7 listed all the grounds witnesses and that her response to interrogatory No. 16 had described Lawson's behavior during the entire marriage. The trial court sustained Lawson's objection and excluded all testimony which was not specifically described in Susie's response to interrogatory No. 16. This ruling essentially barred Susie's corroborative evidence on grounds for divorce excepting testimony from Sam Easley, her son, and Lawson Holladay, the target of her complaint.

¶22. Susie's next witnesses were her sons, Haley and Sam Easley, and her brother, Scott Smith. The trial court excluded most of their testimony on the basis that her response to interrogatory 16 had not specifically set forth discoverable information, and Susie was forced to proffer most of their testimony. The proffers generally revealed that Lawson continually called Susie vile names; that Susie was depressed, upset and unhappy; that she was afraid of Lawson; that she was afraid to engage in social activities with Lawson; that Jennifer was afraid of Susie being around Lawson, and that Lawson drank too much.

¶23. Ann Holladay, Susie's mother-in-law, was the next witness. The trial court confined her testimony to custody, and she testified that Susie and Jennifer had spent the night at her home several times during the summer of 1997. She testified that Jennifer was nervous about Susie being around Lawson and that Lawson had a reputation for violence in the community.

¶24. Becky Tollison was allowed to testify about the Halloween party incident in 1994 as it related to custody. She testified that she called Lawson several times from her van with the request that he release Jennifer; that she could tell he had been drinking, and that Lawson called Susie bad names which she could only repeat by abbreviation. Tollison testified that Susie was withdrawn, cried a lot and was easily upset. Tollison advised that she did not like to socialize with Lawson because of his excessive use of profanity. Susie's counsel then asked if Tollison was familiar with Lawson's reputation for violence in the community and the witness answered in the affirmative.[2] Tollison advised that Lawson had a bad reputation of violence with his spouse in the community.

¶25. Judy Tranum testified that Jennifer was a nervous child and that her stomach hurt, but the trial court struck her answer in response to Lawson's objection. She testified that Lawson's drinking caused him to be

loud and obnoxious. According to Tranum, Lawson had a reputation for violence and abuse in the community, but the trial court struck any reference to his abusiveness because it dealt with grounds for divorce.

¶26. Susie's last witness was Camille Branton, Ph.D., who was tendered as an expert in the fields of mental development for children and domestic violence. Prior to Dr. Branton taking the stand, a motion in limine was heard which was filed prior to the resumption of proceedings on March 30, 1998. The motion essentially sought to exclude any testimony by Dr. Branton pertaining to grounds for divorce as set forth in her report dated March 25, 1998. After admitting her resume' into evidence as Exhibit 21 and hearing Lawson's objection to any testimony on grounds for divorce, the trial court qualified her as an expert, but limited her testimony to the field of children's counseling. Dr. Branton's testimony began as follows:

> By Ms. Wegner (Susie's attorney):
>
> Q. Now when did you first see Susie, Jennifer or Lawson?
>
> A. In November of 1994.
>
> Q. And who did you first see?
>
> A. Susie.
>
> Q. And what concerns did Susie express to you?
>
> A. Her daughter.

¶27. At this point Lawson objected, and a lengthy exchange transpired between the trial court and counsel concerning the limitations of Dr. Branton's testimony. The trial court made a ruling:

> I'll let her testify to things related to the child. If it gets into her own question, what she [Susie] perceives or how she felt or how she was treated or anything of that nature, which would go to the question of divorce, I'm not going to let her testify to that. If it goes to the meaning of information which will be a part of the history that she necessarily had to have prior to the treatment, then I'll let her tell it. But if it is another way to go to the question of divorce, I'll strike it. Now, I hope you [Dr. Branton] understand that.

¶28. Dr. Branton the testified as follows:

> She [Jennifer] had stated that she was afraid for her mother because her daddy had hurt her mother. She was afraid that she would be kept from her mother because at one time, at some point, she was at home and her daddy had locked her mother out.

¶29. Lawson promptly objected to the testimony and argued that the basis of the evidence was a "back-door" way to admit evidence going to grounds for divorce. Susie's counsel argued that her response to Lawson's interrogatory No. 8 had been answered and supplemented twice --- once with a report from Dr. Branton dated December 8, 1997, and again with a report dated March 25, 1998, but the trial court held that Dr. Branton testimony would be limited to the issue of custody as detailed in her December 8, 1997 report.

¶30. Dr. Branton then testified about the times she had professionally consulted with Jennifer. She routinely gave children her telephone number so they could call her if they were having problems, and she testified that Jennifer had called her two or three times. According to Dr. Branton, Jennifer was upset because her parents were fussing. Dr. Branton further testified that Susie called her and requested help for Jennifer because she appeared to be having anxiety symptoms (stomach aches) as a result of Susie's separation from Lawson. Dr. Branton's testimony continued:

> Jennifer continued to show a great deal of fear and anxiety. She was having nightmares again. She described some of those to me. Throughout every time I talked with her, the major issue that seemed to concern her was the fear for her mother. She was very afraid something would happen to her mother, that her mother would be hurt or taken away from her.

¶31. Dr. Branton was allowed to remain in the courtroom during Lawson's cross-examination because she was an expert witness. During his cross-examination, Lawson alleged four instances in which Susie acted violently. Counsel for Susie asked Dr. Branton whether she had an opinion of whether Susie was capable of such conduct as spitting, hitting, cursing, tearing a T shirt or "getting after him" with a knife. Lawson objected, and after another lengthy exchange between the attorneys, the trial court sustained the objection. Susie's attorney then asked Dr. Branton if she had recommended that Susie receive treatment for domestic violence, and the trial court again sustained the objection.

¶32. Since the trial court disallowed testimony from Dr. Branton going to grounds for divorce, counsel for Susie proffered Dr. Branton's testimony concerning Susie's emotional state: Susie was very nervous, anxious and almost withdrawn. She was very teary a great deal of the time. She appeared to be afraid and possibly somewhat upset and depressed. She had an extreme fear of Lawson. She was afraid for her safety because she did not know when Lawson would become enraged and seriously hurt her. Susie could not erase the violent incident involving Lawson which occurred before the marriage. Dr. Branton did not recommend that Susie seek counseling, but rather directed her to group therapy to increase her self-esteem. Dr. Branton further testified that Susie was not capable of the violent acts alleged by Lawson during his testimony.

¶33. After cross examination and re-direct of Dr. Branton, Susie rested. Lawson moved the trial court to "exclude the evidence and dismiss the complaint." After oral arguments the trial court granted the motion in a bench opinion which was transcribed into the record. On April 14, 1998, the trial court issued an order of dismissal with prejudice. Being aggrieved, Susie perfected her appeal.

## DISCUSSION

### I. WHETHER THE TRIAL COURT ERRED IN FINDING DISCOVERY VIOLATIONS AND THEREBY EXCLUDING LAY AND EXPERT TESTIMONY.

#### A. The Excluded Testimony of Lay Witnesses

¶34. After Susie's testimony was completed on March 30, 1998, she called her sister, Judy Koslow. The court first excluded Judy's statement that "I could determine from the conversation with me, she seemed to be very upset." When Judy began testifying about an incident she had witnessed when Lawson had demonstrated verbal and physical abuse to Susie, Lawson objected on the grounds that the particular incident had not been mentioned in Susie's response to Interrogatory No. 16. Susie set out in her response that Lawson had demonstrated violent and abusive conduct to her on a continuing daily basis. She then set

out numerous incidents of this abuse. In her response to Interrogatory No. 7, she listed the names of all witnesses who she called at trial. The court sustained the objection and excluded all testimony which was not specifically described in Interrogatory Response No. 16.

¶35. M.R.E. 102 states that "these rules shall be construed to secure fairness and administration, elimination of unjustifiable expense and delay, and promotion and growth and development of the law of evidence to the end that the truth may be ascertained and proceedings justly determined." To exclude all of the testimony of Susie's witnesses on the grounds that she did not repeat their identity in one interrogatory when they had already been identified in another interrogatory is contrary to both the spirit and the letter of the Rules of Evidence. Lawson had notice of all of the identities of all of Susie's witnesses on October 24, 1997, in ample time to take their depositions, and five months before any of the witnesses were called at trial. He also had notice of all the incidents to which the witnesses would testify except for two instances related by Susie's sister. Lawson suffered no surprise or ambush. Susie suffered irreparable loss when she was not allowed to introduce the testimony of any of her witnesses to the grounds for her divorce on habitual cruel and inhuman treatment.

¶36. While we have upheld the exclusion of lay witness testimony for a party's failure to timely identify the witnesses, the cases cited by Lawson concern gross abuses of discovery which resulted in unfair prejudice and irreparable loss to the opposite party. We have recently reversed and remanded a domestic case for the chancery court's error in excluding evidence. *Talbert v. Talbert*, 759 So.2d 1105 (Miss.1999). The chancery court had excluded Ms. Talbert's letters written during the course of her therapy with her psychotherapist but had allowed Mr. Talbert to testify about their content. The Court of Appeals ruled it was harmless error but we held that the exclusion of the letters was not harmless and required reversal. *Id.* at 1109-10.

¶37. We also reversed the trial court in *McCollum v. Franklin*, 608 So.2d 692, 693-94 (Miss. 1992), holding as error the exclusion of a fact witness as a discovery sanction. The plaintiff sought to call a fact witness whom she failed to list as a witness in her response to interrogatories. The trial court excluded the testimony. In reversing, we stated:

> It is clear that the trial court failed to properly respond to the objection based on lack of discovery. Exclusion of evidence is a last resort. Every reasonable alternative means of assuring the elimination of any prejudice to the moving party and the proper sanction against the offending party should be explored before ordering exclusion.
>
> ....................................
>
> Here the information concerning Jefferson as a witness was known to the defendant through the police report and McCollum's deposition. The report contained Jefferson's name, address and telephone number and the notation that he did not actually see the accident. The defendant could not claim surprises at the fact that Jefferson was a witness. The only fact not know to defendant, presumably, is that McCollum would call Jefferson.

*Id.* at 694.

¶38. In *Eastover Bank for Savs. v. Hall*, 587 So.2d 266, 271 (Miss. 1991), the trial court allowed the testimony of two lay witnesses for Eastover who were not identified to Hall until nine days or less before

trial. Counsel for Hall was able to make contact with one of the witnesses before trial. We held that:

> The predominant concern is whether there has been prejudice to Don Hall. An abuse of discretion on the part of the lower part would be difficult to find otherwise. Mischa Harper and Dorothy Bryant were not expert witnesses, as in several of the cases noted above, and this figured in the lower court's decision as to how much time Don Hall might have needed to prepare for their testimony. Also, Hall had managed to have an investigator interview Harper. We find no abuse of discretion in the chancellor's decision to allow testimony of these two witnesses.

¶39. In support of excluding the testimony of Susie's lay witnesses, Lawson cited *Schepens v. Schepens*, 592 So.2d 108 (Miss. 1991), which is distinguishable. In *Schepens*, the husband filed his response to the second set of interrogatories, which included two non-family witnesses only four days before trial. The trial court, nevertheless, refused the wife's motion for continuance to allow her to take the depositions of the witnesses and allowed them to testify. Because the question of custody was close, we held that the wife's lack of an opportunity to prepare for the two adverse, non-family witnesses could have affected the evidence presented and, necessarily, the chancellor's decision.

¶40. Lawson knew the names of all Susie's trial witnesses on October 24, 1997, long before they were called to testify on March 30, 1998, and in ample time to take their deposition or investigate the basis of their testimony in preparation for cross-examination. Susie had identified all of the lay witnesses who she called at trial when she responded to Lawson's Interrogatory No. 7. Lawson knew the identity of all the witnesses who might be called at trial. The exclusion of Susie's evidence was devastating to her case and its admission would have resulted in no injury or surprise to Lawson. "Further, for a case to be reversed on the admission or exclusion of evidence, it must result in prejudice and harm or adversely affect a substantial right of a party." *Terrain Enters., Inc. v. Mockbee*, 654 So.2d 1122, 1131 (Miss. 1995). "Error is reversible only where it is of such magnitude as to leave no doubt that the appellant was unduly prejudiced." *In re Estate of Mask*, 703 So.2d 852, 859 (Miss. 1997). This is just such a case. The chancery court abused its discretion in excluding this evidence.

### B. The Excluded Testimony of Dr. Camille Branton

1. Testimony Relating to Custody of Jennifer Holladay

¶41. Dr. Camile Branton was listed as an expert in Susie's response to interrogatory No. 8, which was filed on October 24, 1997. Susie supplemented the original response with Dr. Branton's opinion on December 1, 1997, and on December 8, 1997, she again supplemented the response with Dr, Branton's resume' and a detailed report in which Dr. Branton gave her opinion on custody of Jennifer and on the turmoil of the marriage. The record reflects that the chancery court limited Dr. Branton's testimony concerning Jennifer to the literal words of her report of December 8, 1997. Dr. Branton had continued to see Jennifer until shortly before trial and her opinion as expressed in her December 8th report did not change before trial. However, she was not allowed to explain or amplify her opinion and recommendation on custody. The trial court restricted her testimony to only the words and phrases actually printed in her report.

¶42. Lawson cites *Square D Co. v. Edwards*, 419 So.2d 1327 (Miss.1982), where we held that if an expert had been deposed, but a party intended to offer an opinion on a different issue than was set forth in the deposition, then the party offering the expert is duty bound to seasonably supplement the expert interrogatory answer prior to trial or else face exclusion of that evidence. Lawson basically argues that Dr.

Branton's proposed testimony as to custody was trial by ambush since the expert was asked to elaborate on her report of December 8, 1997.

¶43. Mississippi Rule of Civil Procedure 26(b)(4)(A)(i) states in pertinent part:

> A party may through interrogatories require any other party to identify each person whom the other party expects to call as an expert witness at trial, to state the subject matter on which the expert is expected to testify, and to state the **substance** of the facts and opinion to which the expert is expected to testify and a **summary** of the grounds for each opinion.

(emphasis added).

¶44. This case is factually distinguishable from *Square D Co. v. Edwards*, 419 So.2d 1327 (Miss.1982). A trial judge must have some discretion in judging whether the answers are sufficient so as to prevent "trial by ambush" or effective cross-examination, but the entire case is not required to be contained in the answer. Nothing in the case law submitted by counsel or the pertinent procedural rule suggests that an expert will be restricted to testify only to the literal words from their opinion and a summary of the related grounds. The very use of the words "substance" and "summary" show that the Rule does not require an expert to state solely the words of their compiled reports. Such a view would place form over substance, and in a chancery court proceeding, we hold that a ruling to that effect is an abuse of discretion. The trial court's limitation of Dr. Branton's testimony under this issue was error.

### 2. Testimony Relating to Grounds for Divorce

¶45. During the trial on January 22, 1998, Susie stated that she had sought counseling for herself during the summer of 1997. Lawson testified on cross examination that he had visited Dr. Branton two or three times with Susie for marriage counseling. In her response to interrogatory No. 16, Susie stated that "Lawson's continued pattern of behavior has forced Susie to suffer emotional and mental anguish and stress and she has had to consult a counselor for herself and for Jennifer." On March 25, 1998, after a continuance and five days before resumption of trial, Susie faxed a supplemental response to Lawson which contained a detailed report on Susie's emotional condition and the resulting effect of the tumultuous marriage. After the trial resumed, Lawson made a motion in limine to exclude *all* of the testimony of Dr. Branton concerning grounds for divorce because the supplemental response of March 25, 1998 was untimely, and the trial court excluded *all* of Dr. Branton's testimony concerning Susie's grounds for divorce.

¶46. We have recently held that seven days notice is insufficient to satisfy Rule 26(f), *Coltharp v. Carnsesale*, 733 So. 2d 780 (Miss. 1999), but the facts of this case are distinguishable. In *Coltharp*, the trial court changed the trial schedule, and the defendants opposed the change because their expert was going to be out of the country during the revised setting. The trial court allowed the defendants to substitute an expert on May 1, 1997, for trial on May 12, 1997. The defendants supplemented their response and identified another orthopedic surgeon on May 2, 1997, but the responses indicated that the new expert's opinions were consistent with the original expert. However, at trial the new expert advanced a completely new theory of the disputed condition with no notice to the plaintiff. We held that the defendants had a duty to supplement the interrogatories with the new theory. In addition, ten days before trial the defendants listed an expert radiologist whose opinions had never been divulged, and the trial court allowed her to testify. The jury returned a verdict for the defendants, and we reversed, holding that it was "trial by ambush" because the plaintiff had not been put on notice of the new theory of the first defense expert or the surprise testimony

of the expert radiologist.

¶47. In the case sub judice, Lawson was on notice from at least January 23, 1998, that Dr. Branton was going to testify on Susie's emotional condition. He knew that she was going to testify on the effect of the marital turmoil as it related to Jennifer since December 8, 1997. He had visited with Dr. Branton for marriage counseling.

¶48. We have not set a definite time in which a party must complete supplemental expert responses. *Motorola Communications & Elecs., Inc. v. Wilkerson*, 555 So.2d 713 (Miss.1989), allowed an expert witness, **not previously identified**, to testify when his identity and the substance of his opinion were revealed to opposing counsel ten days before trial. The trial court reasoned as follows:

> [I]n light of the fact that this testimony is on a very narrow issue and that the expert lives here in Jackson and is available and the issue appears to be one to which a number of persons would be qualified to give testimony, the Court will find that the interrogatories were seasonably-- the answers to interrogatories were seasonably supplemented for this purpose.

We agreed with this statement but commented that, "[I]t's a matter of 'how much' must be accomplished in whatever limited time is available to the short-noticed party prior to trial." *Id.* at 718.

¶49. In *Read v. Southern Pine Elec. Power Ass'n*, 515 So.2d 916, 921-22 (Miss. 1987), a homeowner sued for negligent distribution of electricity. On the Friday before the first day of trial, the homeowner notified the defendant that an electrician would testify who had not previously been identified. The trial court, over defendant's objections, granted a continuance, and the case was tried three months later. There was a jury verdict for the homeowner, but the trial court granted a JNOV in favor of the defendant. On appeal, we reversed the JNOV, holding that there had been no prejudice to the defendant by the expert's testimony because the continuance had allowed for preparation. We did, however, award reasonable expenses and attorney fees to the defendant.

¶50. In *State Highway Comm'n v. Havard*, 508 So.2d 1099 (Miss. 1987), an eminent domain case, a landowner's expert was allowed to testify about comparable sales although the landowner had not previously provided the information to the State. While acknowledging that "a party must not only supplement interrogatories to reveal the substance of expert testimony if not stated originally in the answer to interrogatories," *id.* at 1103, we allowed the testimony, "because MSHC did not request an order compelling discovery when the Havards gave responses it deemed unsatisfactory." *Id.* at 1104 (citing *Denman v. Hardy*, 437 So.2d 426 (Miss.1983)).

¶51. *Denman* concerned the testimony of two expert witnesses for the defendant. The plaintiff objected to the testimony of the first witness because he relied on measurements and field work which was not specifically disclosed in response to the expert interrogatory. We upheld the trial court's admission of the expert testimony because the plaintiff was not misled, holding that, "[T]he entire case is not required to be contained in the answer." *Id.* at 428 n.1. The defendant failed to reveal the name of the second expert witness until the day before trial, and we held that the trial court committed error by admitting his testimony.

¶52. In the cases cited by Lawson, the exclusion of an expert witness was made only when the failure to identify the expert and the substance of their testimony was gross and unfairly prejudiced the opposing party --- circumstances not present in this case. Dr. Branton's testimony relating to grounds for divorce was

no surprise to Lawson. Susie stated in her response to interrogatory No. 16 that "Lawson's continued pattern of behavior has caused Susie to suffer emotional and mental anguish and stress and she has had to consult a counselor for herself and for Jennifer."

¶53. Susie identified Dr. Branton as her expert witness in response to interrogatory No. 8. She supplemented Dr. Branton's opinion both on December 1, 1997, and March 25, 1998. Lawson pleads "trial by ambush" on appeal by way of arguing form over substance. But he fails to show surprise or unfair prejudice by the timeliness of the final supplement to Susie's expert interrogatory response because he had notice of the substance of her testimony and had sufficient time to prepare for cross examination. The chancellor abused his discretion in excluding Dr. Branton's testimony concerning the grounds for divorce.

## II. WHETHER THE TRIAL COURT ERRED IN EXCLUDING HEARSAY STATEMENTS OF JENNIFER HOLLADAY.

¶54. Susie attempted to testify to the emotional and physical condition of her nine-year old daughter, Jennifer, and Lawson objected that the testimony as to what Jennifer had told her mother about her fears and her stomach pains was hearsay. The court sustained the objection and excluded the evidence that Jennifer had not wanted her mother to remain alone with her father during the summer proceeding the separation of the parents, that Jennifer would not go to her own room without her mother, and that Jennifer had stomach pain during this period. Susie's testimony of what Jennifer said and expressed to her should have been admitted as an exception to hearsay pursuant to Mississippi Rule of Evidence 803:

Hearsay Exceptions: Availability of declarant immaterial. The following are not excluded by the hearsay rule even though the declarant is available as a witness:

1. Present Sense Impression. A statement describing an event or condition made while the declarant was perceiving the event or condition or immediately thereafter;

2. Excited Utterance. A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.

3. Then Existing Mental, Emotional, or Physical Condition. A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), . . . .

¶55. Jennifer's statement to her mother was admissible under all three exceptions. Susie attempted to testify to Jennifer's words and actions when Susie would try to put her to bed when it meant that Susie would be left alone with Lawson and Jennifer's demands that Susie remain with her. Susie also tried to testify to Jennifer's fright and hysteria. The statements were made at the time when Jennifer was perceiving the event (her removal from Susie, leaving Susie alone with Lawson), it was an excited utterance as Susie testified that Jennifer was crying and clutching her, and it was an expression of Jennifer's then existing mental and emotional condition. Susie also tried to testify that as a result of the turmoil in the marriage, Jennifer suffered stomach pains. Susie's testimony about Jennifer's statements are admissible under these exceptions.

¶56. The chancery court also excluded Susie's testimony concerning Jennifer's reaction to Susie's leaving her on a trip to Chicago and why she asked her son, Haley, to spend the night. The court severely restricted Susie's testimony that Jennifer had constant, severe stomach aches. The court also excluded the corroborating testimony of other witnesses who testified to Jennifer's physical condition. There was other

corroborating evidence from Dr. Tibbs's records which showed that Jennifer was prescribed Tagamet for stomach ulcers.

¶57. In passing on M.R.E. 803(1), (2), and (3) as they relate to statements of a child, we have held that such statements to social workers, the mother and grandparents were inadmissible under these exceptions because the statements were made days or weeks after the incident took place. *In re C.B.*, 574 So.2d 1369, 1372 (Miss. 1990). The opinion implies, however, that if the statements had been made at the time or immediately following the incident, the statements would have been admissible. Susie attempted to testify to Jennifer's statements at the time the incidents were occurring and these statements were, therefore, admissible. Jennifer's emotional condition was relevant not only because of the issue of custody, but because it was proof of the turmoil in the marriage. Jennifer's fear for Susie was corroborating evidence of Lawson's behavior. The chancery court abused its discretion in excluding the statements Jennifer made to her mother as hearsay.


## III. WHETHER THE TRIAL COURT ERRED IN EXCLUDING PROOF OF AN ALLEGED VIOLENT INCIDENT BEFORE MARRIAGE.

¶58. The court excluded any evidence of an incident occurring shortly before the marriage in which Lawson had severely beaten Susie holding that it was not relevant because it occurred before the marriage. In a proffer, Susie testified as follows:

> He pulled me to the back of my bedroom. He got angry, and he pulled me back there. He was just not himself. He lost control; he was not himself. He beat me. With his head, he beat my head on the bed until I was swollen and bruised. He spat on me and called me a whore, a slut, bitch, cunt. He called me his first wife's name the entire time that he was beating on me. I was so afraid my children would wake up or be terrified or be hurt. I did not scream.

¶59. Mississippi Rule of Evidence 401 defines "relevant evidence" as any evidence having any tendency to make the existence of a fact more or less probable. If the evidence has any probative value at all, the rule favors its admission. The incident which Susie sought to introduce as relevant because it supported her testimony that she was afraid of Lawson when she started raising his voice and threatening her because of his prior action.

¶60. We have recently addressed this issue in ***Bland v. Hill***, 735 So. 2d 414 (Miss. 1999), where we reversed the trial court for excluding evidence of the husband's prior adulterous affair and its effect on the wife's affection. ***Bland*** is analogous to the instant appeal. Hill brought a complaint against Bland for the loss of the affection of Hill's wife and for negligent infliction of emotional distress. The jury found in favor of Hill and awarded him $200,000 in damages. Bland appealed, asserting, among other things, the exclusion of evidence relating to a prior adulterous affair which Hill had with another woman. Ten years prior to the lawsuit, Hill had confessed to his wife, Judy, that he was having an adulterous affair, his lover might be pregnant, that he might be the father, and that if he were, he did not know if he wanted to stay married to Judy. The trial court allowed Bland to make an offer of proof as to what Judy would have testified to concerning Hill's affair. Depositions of the parties and witnesses were also incorporated into the record as part of the offer of proof. Counsel for Bland proffered that Judy would have testified that Hill's affair

destroyed any love, trust and affection that she had had for Hill.

¶61. Judy also testified that she never regained her trust, love and affection for Hill and that the affair was the cause of the break up of her marriage. *Id.* at 416. Prior to the trial, the trial court ruled that no evidence of Hill's affair with another woman would be allowed. The trial court relied in part on the condonation argument. *Id.* at 418-19. We held that the evidence should not have been excluded:

> Whether Judy condoned Buddy Hill's affair is irrelevant. This was not a divorce action on the grounds of adultery where condonation would be a defense. The issue is not whether Judy condoned Buddy's affair, but whether Buddy's affair was still having an affect on the condition of the marriage."

*Id.* at 419. Susie did not claim that the incident was grounds for her divorce, but instead argued that the incident was proof of her fear of Lawson when he became angry and threatened her. Like the adulterous affair in *Bland*, the incident was remote in time and Susie had continued to live with Lawson, but the incident still affected her fear of being physically hurt. The chancery court abused its discretion by excluding this evidence.

### IV. WHETHER THE TRIAL COURT ERRED IN DISMISSING THE COMPLAINT FOR DIVORCE.

¶62. We view the facts of a divorce decree in a light most favorable to the appellee, and may not disturb the chancery decision unless we find it manifestly wrong or unsupported by substantial evidence. *Richard v. Richard*, 711 So.2d 884, 888 (Miss.1998). The Chancellor, as the trier of fact, evaluates the sufficiency of the evidence based on the credibility of the witnesses and the weight of their testimony. *Rawson v. Buta*, 609 So.2d 426, 431 (Miss. 1992). Habitual cruel and inhuman treatment, as grounds for divorce, must be corroborated. *Chapel v. Chapel*, 700 So.2d 593, 597 (Miss. 1997).

¶63. Ignoring all of Susie's proffered testimony, the following facts are uncontroverted: Susie left Lawson twice before the final separation. She sought marriage counseling. Law enforcement authorities were twice involved in marital incidents because of Lawson's violent behavior. Lawson locked Susie out of the home during the Halloween incident in 1994 and refused to allow his daughter to leave the house until the next morning even though she was crying out for her mother. At the time of the last reconciliation in 1994, Lawson entered Charter Behavioral Hospital for treatment and agreed to other conditions for reconciliation. He subsequently demanded that Susie pay him $2,300 out of her net pay of $9,166.03 for additional taxes on his law practice arising from her employment. He closed her bank account, confiscated her checkbook and required her to receive permission before buying clothes for their daughter.

¶64. Habitual cruel and inhuman treatment may be established only by a continuous course of conduct on the part of the offending spouse which was so unkind, unfeeling or brutal as to endanger, or put one in reasonable apprehension of danger to life, limb or health, and further, such conduct must be habitual, that is, done often enough or so continuously that it may reasonably be said to be a permanent condition. *Robison v. Robison*, 722 So.2d 601, 603 (Miss. 1998). Our cases require more than mere unkindness, rudeness, or incompatibility to support the granting of a divorce on the grounds of cruel and inhuman treatment. *Id.* On the other hand, habitual ill-founded accusations, threats and malicious sarcasm, insults and verbal abuse may cause such mental suffering as to destroy health and endanger the life of an innocent spouse. *Id.* Because we have held that the impact of the conduct on the plaintiff suing for divorce under these grounds is crucial, we employ a subjective standard. *Id.* These latter words perfectly describe the marriage which

Susie endured for more than nine years.

¶65. Disregarding the proffered testimony of Susie's witnesses, the chancery court admitted enough evidence to support her divorce on the grounds of habitual cruel and inhuman treatment. While we require a high standard for proving habitual cruelty and inhuman treatment, this Court does not require an impossible one.

## CONCLUSION

¶66. The chancery court abused its discretion by excluding testimony of Susie Holladay's lay witnesses and by restricting the testimony of her designated expert witness to the contents of her disclosed report of December 8, 1997. Although a closer question, the chancery court also erred in excluding Dr. Branton's testimony on whether the marriage adversely impacted Susie Holladay's emotional health. The March 25, 1998, supplemental disclosure of Dr. Branton's report concerning Susie Holladay's grounds for divorce gave Lawson Holladay sufficient notice of the expert testimony. The chancery court erred by granting Lawson Holladay's motion in limine because this supplemental discovery response did not unduly prejudice his ability to depose Dr. Branton or sufficiently investigate her report for effective cross examination.

¶67. Finally, after considering the evidence submitted at trial in the light most favorable to Lawson Holladay, and even ignoring the evidence proffered by Susie Holladay, the chancery court was manifestly wrong as a matter of law in dismissing the complaint for failure to prove a prima facie case of divorce on the grounds of cruel and inhuman treatment. We therefore reverse the judgment of the Sunflower County Chancery Court and remand this case to the Sunflower County Chancery Court for resumption of the trial of this case. Upon resumption of the trial, the chancery court shall allow Lawson the right to offer proof in response to the prima facie case found by this Court, subject to Susie's rebuttal.

¶68. **REVERSED AND REMANDED.**

**PRATHER, C.J., PITTMAN AND BANKS, P.JJ., COBB AND DIAZ, JJ., CONCUR. McRAE, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY SMITH, J. WALLER, J., NOT PARTICIPATING.**

**McRAE, JUSTICE, DISSENTING**:

¶69. Today the majority has written a lengthy opinion and spends the better part of it discussing inflammatory evidence proffered by Susie Holladay and excluded by the chancellor, but holds that she has made a prima facie case and therefore it should not have been dismissed. The question is why the majority feels compelled to discuss excluded proffered testimony in such detail. If a prima facie case is going to be rendered on proffered evidence, the defendant should be allowed to cross examine. Discussion of such testimony can only serve to confuse the holding of this Court and condone character assassination of one of the parties. Often in domestic relations cases, parties will make all sorts of accusations and assertions against each other. This Court, however, need not recite such derogatory comments if they are not pertinent to our holding. A prime example of this is the detailed discussion of an incident between the parties *prior to the marriage*. It was not an abuse of discretion for the chancellor to exclude such evidence from his consideration of the divorce. That incident has absolutely no bearing on the determination of habitual cruel and inhuman treatment during the marriage.

¶70. This Court has clearly established the grounds for granting a divorce based on cruel and inhuman

treatment. Habitual cruel and inhuman treatment may be proveded by a showing of conduct that either (1) endangers life, limb, or health, or creates a reasonable apprehension of such danger, rendering the relationship unsafe for the party seeking relief, or (2) is so unnatural and infamous as to make the marriage revolting to the non-offending spouse and render it impossible for that spouse to discharge the duties of marriage, thus destroying the basis for its continuance. *Daigle v. Daigle*, 626 So.2d 140, 144 (Miss.1993); *see also Gardner v. Gardner*, 618 So.2d 108, 113-14 (Miss.1993); *Rawson v. Buta*, 609 So.2d 426, 431 (Miss.1992); *Wilbourne v. Wilbourne*, 748 So.2d 184, 187 (Miss. Ct. App. 1999). Additionally, when relying on evidence of cruel and in human treatment, a causal relationship must be shown, and it must be related in point of time to the separation. *Fournet v. Fournet*, 481 So.2d 326, 329 (Miss. 1985); *Harrison v. Harrison*, 285 So.2d 752 (Miss.1973); Bunkley and Morse's Amis Divorce and Separation in Mississippi, § 3.14(17) (1957); Benjamin E. Griffith, Recent Decision, 45 Miss.L.J. 1073 (1974).

¶71. Clearly the incident prior to the marriage and the incidents occurring nearly seven years prior to Susie's ultimate filing for divorce are not related to the time of the separation; therefore, the chancellor was not in error to exclude such evidence. The majority notes Lawson's behavior during the summer of 1997 and how his actions negatively affected the marriage. Surely that is a better benchmark for the discussion of events that led to Susie's ultimate filing for divorce. Susie's filing for divorce on November 28, 1994, and the couple's later reconciliation several months later could even be considered a proper time for reviewing treatment based on these grounds, but it would have definitely been an abuse of discretion for the chancellor to look back some ten years prior to the divorce and even prior to the marriage to establish grounds for cruel and inhuman treatment.

¶72. I also dissent to the majority's treatment of the admissibility the Susie's statements wherein she repeated comments and statements made by the child, Jennifer. The majority holds that those statements come in under the exceptions to M.R.E. 803. While some of the statements made by Jennifer might have limited admissibility as excited utterances, those statements are limited to ones made at the time of the event and do not include statements made by Jennifer recalling those feelings. Since Jennifer is available as a witness, she can give in-court testimony to those events if called as a witness. Furthermore, Susie's testimony that Jennifer's complaints of stomach pain were due to the marital problems of her parents was properly excluded by the chancellor. Susie is not a doctor, psychiatrist or child psychologist and cannot testify to any causal connection between Jennifer's stomach pains and the marital difficulties in the home.

¶73. The facts in 1997, although close, are perhaps sufficient for a chancellor to grant a divorce; however, we should not do it here but send it back to the chancellor with instructions, along with the other issues to try. While we can look at surrounding events that are not immediate in time, when considering a divorce on these grounds, we must not look to events so far in the past as to reach back before the vows of marriage were even taken. I cannot condone the majority's decision to include a long discourse of character assassination, when it stated that it need not even consider the discourse to hold that a prima facie case was made. Such unnecessary discussion does nothing to advance the laws of this state nor the administration of justice. It can only serve to confuse the holding of this Court. Accordingly, I dissent.

   **SMITH, J., JOINS THIS OPINION.**

1. Plaintiff's response to defendant's discovery requests was not designated as part of the record, but the pertinent interrogatories and responses were read verbatim into the record and were attached as part of the

plaintiff's brief in the appendix, along with exhibits 21 and 23.

2. At this point Susie's attorney said, "I would like to end my proffer and repeat that question," but a review of the record shows that Tollison was not on proffer and her testimony to that point had been admitted.