# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2017-CT-00411-SCT

*JOSHUA ERIC HAWK CLARK a/k/a JOSHUA
CLARK*

*v.*

*STATE OF MISSISSIPPI*

## <u>ON WRIT OF CERTIORARI</u>

| | |
|---|---|
| DATE OF JUDGMENT: | 03/03/2017 |
| TRIAL JUDGE: | HON. THOMAS J. GARDNER, III |
| TRIAL COURT ATTORNEYS: | JOHN D. WEDDLE |
| | DAVID L. DANIELS |
| | PAUL C. GAULT |
| | RICHARD D. BOWEN |
| | JIM WAIDE |
| | DANIEL M. WAIDE |
| | DAN W. WEBB |
| | CATHERINE C. SERVATI |
| COURT FROM WHICH APPEALED: | ITAWAMBA COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | JIM WAIDE |
| | DAN W. WEBB |
| | DANIEL M. WAIDE |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: SCOTT STUART |
| DISTRICT ATTORNEY: | JOHN DAVID WEDDLE |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | THE JUDGMENT OF THE COURT OF APPEALS IS REVERSED. THE JUDGMENT OF THE ITAWAMBA COUNTY CIRCUIT COURT IS REINSTATED AND AFFIRMED - 02/04/2021 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**CHAMBERLIN, JUSTICE, FOR THE COURT:**

¶1.    Following the death of his four-month-old daughter, Kyllie Clark, and his subsequent indictment for murder under Mississippi Code Section 97-3-19(2)(f) (Rev. 2014), Joshua Clark was convicted of depraved-heart murder under Mississippi Code Section 97-3-19(1)(b).  The prosecution relied heavily on the testimony of Dr. Karen Lakin, a pediatrician who opined that Kyllie's death resulted from Shaken Baby Syndrome (SBS), now referred to as Abusive Head Trauma (AHT).  The Court of Appeals reversed and remanded Clark's conviction after finding that crucial parts of Dr. Lakin's testimony were unreliable and therefore inadmissible.  *Clark v. State*, No. 2017-KA-00411-COA, 2019 WL 5566234 (Miss. Ct. App. Oct. 29, 2019).  This Court granted certiorari on issues raised both by Clark and by the State.

¶2.    We disagree with the conclusion of the Court of Appeals that Dr. Lakin's opinion testimony was inadequately supported to meet the reliability prong of the *Daubert* standard and was thus improperly admitted.  *See **Daubert v. Merrell Dow Pharms., Inc.***, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).  We hold instead that the circuit court did not err by admitting Dr. Lakin's testimony.  Therefore, the judgment of the Court of Appeals is reversed, and the judgment of the Itawamba County Circuit Court is reinstated and affirmed.

¶3.    Further, we find that Clark's six additional assignments of error not previously addressed by the Court of Appeals are without merit.  First, we hold that sufficient evidence existed to establish Clark's guilt beyond a reasonable doubt.  Second, we hold that Mississippi Code Sections 97-3-19(2)(f) and 97-5-39(2)(c)(iii) (Rev. 2014) are not unconstitutionally vague.  Third, we find that the circuit court did not abuse its discretion by

instructing the jury on depraved-heart murder. Fourth, we find that the circuit court did not violate Clark's Sixth and Fourteenth Amendment rights to a fair cross-section of the community by refusing to separate the trials into a guilt phase and a penalty phase so that jurors opposed to the death penalty could sit at the guilt phase. Fifth, we find that the trial court did not err by (a) permitting the introduction of evidence regarding the compensation of Clark's expert, Dr. Shuman; (b) disallowing impeachment evidence regarding Dr. Lakin's divorce and child; or (c) disallowing testimony of Bethany Clark's drug conviction. Sixth, and finally, we find that the circuit court did not abuse its discretion when it admitted, through Dr. Lakin's testimony, the medical report dictated by nurse practitioner Ashley Weiderhold that was later reviewed and signed by Dr. Lakin.

## FACTS

¶4.     On January 5, 2008, Kyllie Clark was left in Clark's sole care at around 3 p.m. when his wife, Bethany, and two teenagers staying with the Clarks left their home. *Clark*, 2019 WL 5566234, at *2. From approximately 3 p.m. to 5:30 p.m., no one besides Clark witnessed what occurred in the Clark household. *Id.* When Bethany and the teenagers returned, Kyllie's condition prompted alarm. *Id.* at *2. Clark said that approximately five or ten minutes before Bethany and the teenagers returned, Kyllie had made a gasping sound. *Id.* After one of the teenagers called 911, Clark brought Kyllie into the bedroom where she went limp. *Id.* Bethany brought Kyllie back to the living room and attempted CPR. *Id.*

¶5.     Kyllie was taken to a local hospital and later transferred to Le Bonheur Children's Hospital in Memphis, Tennessee, for specialized care. *Id.* at *2. Kyllie was diagnosed with

rib fractures, retinal and subdural hemorrhages and brain swelling. *Id.* The hospital staff ultimately declared Kyllie brain dead and terminated life support. *Id.* at \*2. Dr. Lakin, who would later serve as the State's primary witness, examined Kyllie at Le Bonheur and concluded that her death had been caused by SBS/AHT. *Id.* at \*2. Dr. Lakin's conclusion was memorialized in a report dictated by Ashley Weiderhold, a nurse practitioner. Dr. Lakin reviewed and signed the same report.[1]

## STANDARD OF REVIEW

¶6.     "When reviewing a trial court's decision to allow or disallow evidence, including expert testimony, we apply an abuse of discretion standard." *Watts v. Radiator Specialty Co.*, 990 So. 2d 143, 145-46 (Miss. 2008) (internal quotation marks omitted) (quoting *Canadian Nat'l/Ill. Cent. R.R. v. Hall*, 953 So. 2d 1084, 1094 (Miss. 2007)). "Therefore, the decision of a trial court will stand 'unless we conclude that the discretion was arbitrary and clearly erroneous, amounting to an abuse of discretion.'" *Miss. Transp. Comm'n v. McLemore*, 863 So. 2d 31, 34 (Miss. 2003) (quoting *Puckett v. State*, 737 So. 2d 322, 342 (Miss. 1999)).

¶7.     Moreover, "[w]hen testing the sufficiency of the evidence, this Court uses a *de novo* standard of review." *Sanford v. State*, 247 So. 3d 1242, 1244 (citing *Brooks v. State*, 203 So. 3d 1134, 1137 (Miss. 2016)). Thus, "'[t]he relevant question is whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."'" *Id.* (quoting *Hearn v. State*, 3 So. 3d 722, 740 (Miss. 2008)). And "[t]he evidence

---

[1] Additional relevant facts and procedural history concerning the additional six issues raised by Clark on appeal are provided in the discussion of each issue below.

4

is viewed in the light most favorable to the State." *Id.* (quoting *Henley v. State*, 136 So. 3d 413, 415 (Miss. 2014)).

¶8.     Additionally, "[j]ury instructions are generally within the discretion of the trial court and the settled standard of review is abuse of discretion." *Bailey v. State*, 78 So. 3d 308, 315 (Miss. 2012) (citing *Newell v. State*, 49 So. 3d 66, 73 (Miss. 2010)).  We "review[] jury instructions as a whole[,]" and "[w]hen those instructions, 'taken as a whole fairly—although not perfectly—announce the applicable primary rules of law . . . no reversible error will be found.'" *Moody v. State*, 202 So. 3d 1235, 1237 (Miss. 2016) (quoting *Boyd v. State*, 47 So. 3d 121, 123-24 (Miss. 2010).  And "constitutional questions are reviewed de novo." *Armstead v. State*, 196 So. 3d 913, 916 (Miss. 2016) (citing *Smith v. State*, 25 So. 3d 264, 267 (Miss. 2009)).

## DISCUSSION

¶9.     The State and Clark filed petitions for certiorari raising the following three issues: first, whether the Court of Appeals applied an incorrect *Daubert* standard in analyzing the trial court's admission of portions of Dr. Lakin's expert testimony; second, whether, when the Court of Appeals reverses and orders a new trial because the State's expert does not meet Mississippi Rule of Civil Procedure 702 reliability standards, the Court of Appeals must also address the defendant's other assignments of error; and third, whether the Double Jeopardy Clauses of the United States and Mississippi Constitutions forbid retrial in a circumstantial evidence case in which the State does not introduce evidence negating non-criminal, medical causes of the condition causing the injury.  Because we reverse the Court of Appeals based on our analysis of the first issue on certiorari, we do not address the remaining two issues

5

raised on certiorari.  Further, since we are reversing the Court of Appeals and reinstating the judgment of the circuit court, we also must address the remaining six assignments of error raised on appeal.

## I.     Dr. Lakin's Testimony

¶10.    Dr. Lakin, who examined Kyllie at Le Bonheur hospital, became the State's expert witness and testified about SBS/AHT.  At trial, Dr. Lakin testified that she has "lectured extensively in abusive head trauma."  She then went on to explain SBS/AHT to the trial court and to the jury.  She described how around the "late [1960s] or early [1970s]" medical findings showed "injured children" with "intracranial hemorrhages" that resulted from "what we call whiplash injuries."  She continued explaining that these "injuries involve particularly intracranial hemorrhages called subdural hemorrhages, which is a bleeding that occurs in the dura layer of the brain."  She testified that the term used to describe what caused these injuries was "beginning to be used as shaken baby syndrome."  She explained that ultimately, SBS has been reduced to a "component" of the larger diagnosis, AHT.

¶11.    In her testimony, Dr. Lakin importantly distinguished between the possession of a prior "history" and a "lack of significant history."  She testified that in a case in which she knows of a prior history, like a car accident, she would not "report that to Child Protective Services because [she] know[s] that they have been in a car accident and they have sustained those life-threatening or fatal injuries."  She continued to explain that in a case that lacks a prior history in which the child's injuries are consistent with a prior history, like the car accident case, then "in [her] opinion, that combination of findings with a lack of significant history would, in [her] opinion, be consistent with abusive head trauma or nonaccidental

6

trauma."

¶12. Dr. Lakin concluded that the injuries Kyllie suffered were the result of AHT. The Court of Appeals, however, found that the circuit court erred by admitting Dr. Lakin's trial testimony. We disagree. The circuit court did not err by admitting Dr. Lakin's testimony.

¶13. We must not allow ourselves to become the gatekeeper. As we have stated in *McLemore*: "We are confident that our learned trial judges can and will properly assume the role as gatekeeper on questions of admissibility of expert testimony . . . . The trial court can identify the specific indicia of reliability of evidence in a particular technical or scientific field." *McLemore*, 863 So. 2d at 40.

¶14. Rather than becoming the gatekeeper, our function is to determine whether the actual gatekeeper, the trial judge, has abused his discretion in performing that role in a particular case. *Inv'r Res. Servs., Inc. v. Cato*, 15 So. 3d 412, 416 (Miss. 2009). In this case, we conclude that the trial judge properly performed his role as gatekeeper by admitting Dr. Lakin's testimony. The fact that separate members of this Court might come to a different conclusion than the trial judge is of no matter under the applicable standard of review.

¶15. Mississippi Rule of Evidence 702 sets forth the analysis for admitting expert testimony. The rule states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> **(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> **(b)** the testimony is based on sufficient facts or data;

7

**(c)** the testimony is the product of reliable principles and methods; and

**(d)** the expert has reliably applied the principles and methods to the facts of the case.

MRE 702.[2]

¶16. "Under Mississippi Rule of Evidence 702, expert testimony should be admitted only when the trial court can affirmatively answer a two-fold inquiry." ***Kan. City S. Ry. v. Johnson***, 798 So. 2d 374, 382 (Miss. 2001), *superseded by rule as stated in **McLemore***, 863 So. 2d 31. The first prong mandates that a witness must be qualified by virtue of his or her knowledge, skill, experience, or education. ***Id.*** (citing MRE 702). Second, "the witness's scientific, technical, or other specialized knowledge must assist the trier of fact to understand or decide a fact in issue." ***Id.*** (citing MRE 702). Put simply, the expert's proposed testimony must be both relevant to the case at hand and based on reliable methodology. This standard is generally known as the ***Daubert*** standard. *See **McLemore***, 863 So. 2d at 35 (adopting the federal standard for admissibility of expert witness testimony articulated in ***Daubert***, 509 U.S. at 592-594, for Mississippi courts).

¶17. In amending Rule 702 in 2003, this Court recognized that trial courts are vested with a gatekeeping responsibility to determine whether the expert testimony presented is both relevant and reliable. MRE 702 advisory committee note. It is the task of the trial court to make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether the reasoning or methodology properly can

---

[2]Mississippi Rule of Evidence 702 is identical to Rule 702 of the Federal Rules of Evidence.

8

be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93.

¶18.    In applying the *Daubert* standard, we must first determine whether Dr. Lakin's expert testimony was relevant to the case at hand. The Mississippi Rules of Evidence define evidence as relevant if "**(a)** it has any tendency to make a fact more or less probable than it would be without the evidence; and **(b)** the fact is of consequence in determining the case." MRE 401. "[T]he threshold for admissibility of relevant evidence is not great. Evidence is relevant if it has any tendency to prove a consequential fact." *McLemore*, 863 So. 2d at 40 (internal quotation marks omitted) (quoting *Whitten v. Cox*, 799 So. 2d 1, 15 (Miss. 2000)).

¶19.    We find that Dr. Lakin's opinion as to the cause of Kyllie's death was relevant and satisfies the first prong of the *Daubert* standard. It was the second prong of the *Daubert* standard that concerned the Court of Appeals.  After careful review, however, this Court concludes that this prong, too, was satisfied.

¶20.    First, the Court of Appeals found fault with the specific wording used by the trial judge to show that Dr. Lakin's testimony was reliable. *Clark*, 2019 WL 5566234, at *9-10. The trial judge found, in part, that "she is qualified to testify."  This statement was construed by the Court of Appeals to mean that no consideration was given to relevance or reliability. *See id.*  But magic words are not required under the *Daubert* standard or elsewhere. *Jones v. State*, 920 So. 2d 465, 476 (Miss. 2006) ("magic words" not necessary in the context of Rule 403).  The trial judge clearly found the testimony admissible both by acknowledging the availability to the defense of cross-examination and by, of course, allowing the testimony in the trial.  The judge's duty is to perform the gatekeeper function and to leave for us a record sufficient to allow us to determine that the function was performed and supported by

9

the record submitted. We have before us the record, and it is sufficient for us to determine whether the trial judge abused his discretion. The fact that the judge lumped the ***Daubert*** finding under the phrase "qualified to testify" is of no importance here because it is clear that the judge considered not only Dr. Lakin's qualifications but also the relevance and reliability of her expert testimony concerning SBS/AHT. The record clearly shows that the trial judge had the issues regarding the actual SBS/AHT testimony squarely before it when it determined Dr. Lakin to be "qualified to testify."

¶21. Second, the Court of Appeals relied on the fact that Dr. Lakin lacked recall of certain literature supporting her theories and conceded articles in opposition to her testimony. ***Clark***, 2019 WL 5566234, at *8-9. Of course, failing to recall certain articles in a scientific field cannot be uncommon and opposition articles in a contentious field are to be expected. This is what cross-examination of an expert witness is all about. An appellate court that deems concessions on cross-examination to be disqualifying not only thrusts that court squarely into the role of gatekeeper, but it also threatens to establish an expert-witness threshold so high that it borders on perfection.

¶22. Dr. Lakin was required to provide evidence of support and acceptance in the scientific community. ***Patterson v. Tibbs***, 60 So. 3d 742, 751 (Miss. 2011). She did so by citing the American Academy of Pediatrics (AAP) as well as its Canadian counterpart and supporting evidence from the Centers for Disease Control. Specifically, Dr. Lakin testified that she was member of the AAP. Further, when asked if the AAP recognizes and accepts SBS/AHT, not only did Dr. Lakin respond affirmatively, but she went on to testify that SBS/AHT is accepted "by a number of other medical governing organizations" including the Centers for

10

Disease Control which, according to Dr. Lakin, "funds research in abusive head trauma." She further testified that numerous peer-reviewed articles across different disciplines supported SBS/AHT.

¶23. The Court of Appeals also compared testimony of the expert witness for the defense to that of Dr. Lakin. *Clark*, 2019 WL 5566234, at \*5. While this Court might consider opposing testimonies in an evaluation of the weight or sufficiency of the evidence, we have no place comparing the two in determining the admissibility of one of their opinions. That one party's expert witness contradicts the testimony of the other party's expert witness should come as no surprise. We even have a name for it. We call it a "battle of the experts." *Hill v. Mills*, 26 So. 3d 322, 330 (Miss. 2010). The fact the Court of Appeals may itself deem the expert testimony from the defense as better than that of Dr. Lakin's testimony is irrelevant to the admissibility of Dr. Lakin's testimony. *See* **Gen. Motors Corp. v. Pegues**, 738 So. 2d 746, 753 (Miss. Ct. App. 1998) ("When the evidence is conflicting, we defer to the jury's determination of the credibility of witnesses and the weight of their testimony." (internal quotation marks omitted) (quoting *Ducker v. Moore*, 680 So. 2d 808, 811 (Miss. 1996))). This Court has held that the winner in a battle of experts is to decided by a jury. *Hill*, 26 So. 3d at 322; *see, e.g*, *Bickham v. Grant*, 861 So. 2d 299, 307 (Miss. 2003).

¶24. This brings us to the real problem in this case: it is not so much the testimony of Dr. Lakin as it is the fact that the SBS/AHT diagnosis has been increasingly questioned in recent years. The Court of Appeals recognized this difficulty in its decision as did the trial judge, who stated that he was not "insensitive to the fact that there may be difficulty or some difference of opinion about that which is called SBS." If we wish to take it upon ourselves

11

to determine that some theory has been debunked, that is certainly within our power if appropriately supported by the science. But we must continue to remember that we are jurists, not scientists. Judges are increasingly asked to make scientific determinations based on contradictory science despite not being qualified to do so. Science by nature is seldom certain, and thus the validation of a proposed submission need not be universally accepted. *Daubert*, 509 U.S. at 590. The fact that experts hold opposite views does not make the testimony inadmissible.[3]

## II.    Remaining Issues on Appeal

¶25.    Clark raises six additional arguments not addressed by the Court of Appeals.[4] Since we are reinstating the trial court's judgment and affirming Clark's conviction, we address each remaining issue in turn below.

> *A.    Whether the evidence at trial was insufficient to establish guilt beyond a reasonable doubt and to the exclusion of every reasonable hypothesis of innocence.*

---

[3] We acknowledge the academic debates surrounding SBS/AHT. *See* AK Choudhary et al., *Consensus Statement on Abusive Head Trauma in Infants and Young Children*, 48 Pediatric Radiology 1048 (2018); Joëlle A. Moreno & Brian Holmgren, *Dissent Into Confusion: The Supreme Court, Denialism, and the False "Scientific" Controversy Over Shaken Baby Syndrome*, 2013 Utah L. Rev. 153; *but see* Randy Papetti et al., *Outside the Echo Chamber: A Response to the "Consensus Statement on Abusive Head Trauma in Infants and Young Children"*, 59 Santa Clara L. Rev. 299 (2019). As we make this acknowledgment, however, we recognize that the centerpiece of this case is *expert witness testimony*, and it is ultimately the "responsibility of the jury and not the appellate court to draw conclusions based on the evidence presented at trial. A reviewing court 'may set aside the jury's verdict on the ground of insufficient evidence *only if* no rational trier of fact could have agreed with the jury.'" Moreno & Holmgren, at 209 (emphasis added) (quoting *Cavazos v. Smith*, 565 U.S. 1, 2, 132 S. Ct. 2, 181 L. Ed. 2d 311 (2011)).

[4] The issues provided in subheadings A through F are slightly modified for clarity from Clark's "Corrected Brief of Appellant."

¶26.    In his first remaining argument on appeal, Clark argues that the evidence presented at trial was insufficient to establish guilt beyond a reasonable doubt and to the exclusion of every reasonable hypothesis of innocence.  Clark points to *Weathersby v. State*, 147 So. 481, 482 (1933), arguing that since no substantial evidence to contradict Clark's version of events was presented at trial, the trial court was required to enter a directed verdict.  Clark qualifies his argument that the evidence presented in this case requires a review of *Weathersby*: "[a]bsent the opinion testimony of the expert witness, the conviction must be evaluated in light of the *Weathersby* rule . . . ."

¶27.    A review of the record and Clark's motions for directed verdict reveals that while Clark made a similar argument before the trial court, he failed to specifically raise an argument regarding *Weathersby*.  Since Clark failed to raise the *Weathersby* rule as a defense before the circuit court, the issue is procedurally barred on appeal.  *Jones v. State*, 154 So. 3d 872, 877 (Miss. 2014) (citing *Page v. State*, 64 So. 3d 482, 489 (Miss. 2011)).  Procedural bar notwithstanding, we find Clark's *Weathersby* argument to be without merit.

¶28.    In *Weathersby*, we recognized a rule

> in this state that where the defendant or the defendant's witnesses are the only eyewitnesses to the homicide, their version, if reasonable, must be accepted as true, unless substantially contradicted in material particulars by a credible witness or witnesses for the state, or by the physical facts or by the facts of common knowledge.

*Weathersby*, 147 So. at 482 (citing *Houston v. State*, 78 So. 182 (Miss. 1918)).  Indeed, "[w]here the *Weathersby* rule applies and the defendant's version affords an absolute legal defense, the defendant is entitled to a directed verdict of acquittal."  *Green v. State*, 631 So. 2d 167, 174 (citing *Blanks v. State*, 547 So. 2d 29, 33 (Miss. 1989)).  Additionally,

13

"*Weathersby* does not require the State to offer evidence excluding the defendant's theory from the realm of possibility; rather, the State must offer evidence that substantially contradicts the material particulars of the defendant's version of the incident." *Booker v. State*, 64 So. 3d 965, 974 (Miss. 2011) (citing *Weathersby*, 147 So. at 482).

¶29.    In *Booker*, we looked to expert witness testimony to determine whether a defendant's version of events were unlikely. *Id.* at 975. In that case, a pathologist expert witness testified that while the defendant's version of events were possible, the same version of events were "very unlikely" based on the expert's assessment of statistical probabilities associated with the expert's observations. *Id.* We opined, "this expert testimony, admissible under our rules of evidence, substantially contradicted Booker's version of the incident and created a question for the jury to resolve." *Id.* at 975-76 (footnote omitted).

¶30.    Here, as in *Booker*, Clark's alternative causes for Kyllie's death were substantially contradicted by the expert witness testimony of Dr. Lakin. As discussed above, Dr. Lakin testified that "in [her] opinion, that combination of findings with a lack of significant history would, in [her] opinion, be consistent with abusive head trauma or nonaccidental trauma." We have already upheld the circuit court's determination under *Daubert* that Dr. Lakin's testimony was admissible. Her testimony contradicts Clark's alternative theories of Kyllie's injuries such that a question was created for the jury to resolve. *See Booker*, 64 So. 3d at 975-76. Indeed, Clark's own *Weathersby* argument is qualified by the condition that Dr. Lakin's testimony was admitted erroneously—an argument that we have already rejected. Therefore, Clark's *Weathersby* argument is without merit.

¶31.    In furtherance of his broader argument, Clark points to testimony which, in his

14

opinion, shows that insufficient evidence was presented to support the jury's guilty verdict. Clark points to conflicting evidence presented to the jury that indicated, among other things, that Kyllie was dropped on two occasions prior to the time Clark was alleged to have committed the crime. He additionally discusses dueling expert witness testimony from Dr. Shuman and Dr. Lakin regarding potential and probable causes of Kyllie Clark's injuries and subsequent death, including testimony calling into question the State's timeline of events. Further, Clark argues that testimony presented fails to negate other reasonable hypotheses as to the cause of Kyllie's death: that Kyllie was either injured at birth, through a fall, by being dropped days before Clark had exclusive custody of Kyllie or that Sudden Infant Death Syndrome (SIDS) occurred.[5]

---

[5] On January 26, 2021, we received Clark's letter pursuant to Mississippi Rule of Appellate Procedure 28(k). M.R.A.P. 28(k). In the letter, in addition to highlighting recent literature regarding AHT, Clark argues that our recent decision in *Hampton v. State*, No. 2019-KA-01304-SCT, 2021 WL 218983, at *1 (Miss. Jan. 21, 2021), supports his argument that the State failed to prove that Clark was guilty beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence. *See, e.g., Steele v. State*, 544 So. 2d 802, 808 (Miss. 1989) (citing *Leflore v. State*, 535 So. 2d 68, 70 (Miss. 1988)). We disagree. In *Hampton*, we reversed Hampton's conviction for felony child abuse where "Dr. Lakin testified only to the severity of the burns and that the burns appeared to be more than a few days old." *Hampton*, 2021 WL 218983, at *9. Additionally, Dr. Lakin "only went so far as to state that in her professional opinion, a caregiver aware of such burns would seek medical care for the burns." *Id.* These statements constituted Dr. Lakin's sole testimony regarding the victim's burn injury. *Id.* Therefore, we held that "[e]ven though one could reasonably conclude from the evidence presented that Hampton knew about LRJ's injury and failed to seek necessary medical care for it, one cannot infer from this same evidence that because Hampton did not seek medical care for LRJ she must have knowingly or recklessly caused the injury." *Id.* at *10 (footnote omitted). Since the State failed to prove Hampton's guilt beyond a reasonable doubt to the exclusion of every reasonable hypothesis consistent with innocence, the State's burden was not met. *See id.* In contrast, we affirmed Hampton's conviction for felonious starvation under the same standard where "Dr. Lakin provided evidence that excluded the possibility that LRJ's malnourished state was the result of some sort of medical condition . . . [a]nd she and other witnesses provided evidence that

his malnourishment continued while in Hampton's care." *Id.* at \*9.

Dr. Lakin's testimony in Clark's case is more similar to that provided in ***Hampton*** for the felonious starvation charge. For example, Clark asserts that the State failed to exclude the reasonable, non-criminal hypotheses advanced by Clark for Kyllie's death including SIDS, an accidental dropping, that Kyllie was stepped on and CPR performed on Kyllie. In support, Clark points to various portions of testimony regarding both the occurrence of potential non-criminal, accidental causes of Kyllie's injuries and testimony from Dr. Lakin admitting either that the same causes were either possible or could not be ruled out. In isolation, Clark's argument about ***Hampton*** could work. Clark, however, ignores Dr. Lakin's testimony that does exclude these alternative theories.

Specifically, after the State asked Dr. Lakin for an approximation of the time Kyllie sustained her injuries to a medical certainty, Dr. Lakin responded, "[b]ased on the history that was given to me, it would have to be sometime between her most recent normal activity, it would be sometime after her most recent normal activity to the time when she was found unconscious. And so in my experience, the symptoms are immediate." The State then asked, "[a]nd the last time of normal activity, as given to you in the history, was?" Dr. Lakin responded, "5:00 when she ate." Therefore, contrary to Clark's argument, the State did prove Clark's guilt beyond a reasonable doubt to the exclusion of hypotheses consistent with innocence that rely on the fact that Kyllie's injuries occurred prior to the period where Clark had sole custody of Kyllie. When questioned about the elimination of SIDS as a cause of Kyllie's death on cross-examination, Dr. Lakin provided that "[t]his child had multiple abnormal physical findings — the subdural hemorrhage, the rib fractures, the retinal — multilayer retinal hemorrhages. You can't even entertain the possibility of sudden infant death syndrome because there are so many abnormalities." Thus, the State did prove Clark's guilt to the exclusion of SIDS as a possibility for Kyllie's death.

Further, Dr. Lakin testified as her conclusion as to Kyllie's death: "[w]ell, the injuries that the patient did sustain were consistent with abusive head trauma, so it's a nonaccidental mechanism which involves some type of very severe acceleration and deceleration which very much could have been a shaking — a severe shaking episode." Finally, Dr. Lakin testified that "[i]n my opinion, the injuries that killed Kyllie was [sic] a severe acceleration/deceleration injury, which is consistent with shaking, and it is consistent with abusive head trauma. And that is my opinion." Given Dr. Lakin's extensive testimony regarding the cause of Kyllie's injuries and death and her insistence that, based on her medical opinion, Kyllie's injuries and death were the result of a nonaccidental event consistent with AHT, the State was able to exclude Clark's alternative theories consistent with innocence and, therefore, Clark's reliance on ***Hampton*** is misplaced.

16

¶32. When the evidence is viewed in the light most favorable to the State, it is clear that a rational trier of fact could have found the essential elements of depraved-heart murder beyond a reasonable doubt. *See Sanford*, 247 So. 3d at 1244. The elements of depraved-heart murder are as follows: "[t]he killing of a human being without the authority of law by any means or in any manner . . . [w]hen done in the commission of an act eminently dangerous to others and evincing a depraved heart, regardless of human life, although without any premeditated design to effect the death of any particular individual[.]" *Montgomery v. State*, 253 So. 3d 305, 316 (Miss. 2018) (alterations in original) (internal quotation marks omitted) (quoting Miss. Code Ann. § 97-3-19(1)(b) (Rev. 2014)).

¶33. First, there was evidence that Kyllie Clark was killed. Second, the cause of Kyllie's injuries and resulting death, in Dr. Lakin's opinion, supported a finding that her cause of death was the result of acts imminently dangerous and evincing a depraved heart. *See id.* To that end, Dr. Lakin testified extensively that Kyllie's condition was consistent, in her opinion, with AHT or nonaccidental trauma. Moreover, Dr. Lakin testified that injuries consistent with those sustained by Kyllie are possibly caused by the mechanism of "very rapid acceleration and deceleration, which include shaking as a possible mechanism." Therefore, despite conflicting testimony elicited at trial, when viewed in the light most favorable to the State, we find that a rational trier of fact could have found the essential elements of depraved-heart murder beyond a reasonable doubt. Thus, Clark's argument that insufficient evidence was presented to support the jury's finding that he was guilty beyond is without merit.

         B.     *Whether, under **Johnson v. United States**, 576 U.S. 591,*

17

*135 S. Ct. 2551, L. Ed. 2d 569 (2015), both Mississippi Code Sections 97-3-19(2)(f) and 97-5-39(2)(c) are unconstitutionally vague.*

¶34.    Clark argues that sections 97-3-19(2)(f) and 97-5-39(2)(c) of the Mississippi Code are unconstitutionally vague.  Section 97-3-19(2)(f) provides that

> (2)    The killing of a human being without the authority of law by any means or in any manner shall be capital murder in the following cases:
>
> . . . .
>
> (f)    When done with or without any design to effect death, by any person engaged in the commission of the crime of felonious abuse and/or battery of a child in violation of subsection (2) of Section 97-5-39, or in any attempt to a commit such felony[.]

Miss. Code Ann. § 97-3-19(2)(f) (Rev. 2014).  Section 97-5-39(2)(c) provides the following:

> (2)    Any person shall be guilty of felonious child abuse in the following circumstances:
>
> . . . .
>
> (c)    If serious bodily harm to any child actually occurs, and if the person shall intentionally, knowingly, or recklessly:
>
> > (i)    Strike any child on the face or head;
> > (ii)    Disfigure or scar any child;
> > (iii)    Whip, strike, or otherwise abuse any child[.]

Miss. Code Ann. § 97-5-39(2)(c) (Rev. 2014).

¶35.    Clark specifically takes issue with section 97-5-39(2)(c)(iii) and its so-called "catch-all" language, "otherwise abuse any child."  Clark contends that the United States Supreme Court, in ***Johnson v. United States***, 576 U.S. 591, 135 S. Ct. 2551, L. Ed. 2d 569 (2015), held a provision similar to Section 97-5-39(2)(c)(iii) unconstitutionally vague.  In ***Johnson***, the Court examined 18 U.S.C. § 924(e)(2)(B), the statute defining a "violent felony" under

the Armed Career Criminal Act of 1984 as, among other things, "any felony that 'involves conduct that presents a serious potential risk of physical injury to another.'" *See id.* at 593 (internal quotation marks omitted) (quoting 18 U.S.C. § 924(e)(2)(B)). This "residual clause" was applied to a Minnesota offense of "unlawful possession of a short-barreled shotgun." *Id.* at 594.

¶36. The *Johnson* Court noted two features that left the residual clause at issue unconstitutionally vague: (1) the clause "leaves grave uncertainty about how to estimate the risk posed by a crime" and "ties the judicial assessment of risk to a judicially imagined 'ordinary case' of a crime, not to real-world facts or statutory elements" and (2) the "clause leaves uncertainty about how much risk it takes for a crime to qualify as a violent felony." *Id.* at 597-98. In "combining indeterminacy about how to measure the risk posed by a crime with indeterminacy about how much risk it takes for the crime to qualify as a violent felony," the Court held that "the residual clause produces more unpredictability and arbitrariness than the Due Process Clause tolerates." *Id.* at 598.

¶37. *Johnson* is distinguishable here. We have recognized that "[a] criminal statute must provide a person of ordinary intelligence a reasonable opportunity to know what conduct is prohibited." *Faraga v. State*, 514 So. 2d 295, 303 (Miss. 1987) (citing *Cumbest v. State*, 456 So. 2d 209 (Miss. 1984)). In *Rubenstein v. State*, 941 So. 2d 735, 772 (Miss. 2006) (quoting *Faraga*, 514 So. 2d at 303), we held that Mississippi Code Section 97-5-39(2)(a) was not unconstitutionally vague, reasoning that Section 97-5-39(a) afforded "'a person of ordinary intelligence a reasonable opportunity to know what conduct is prohibited.'" The subsection at issue in *Rubenstein* read as follows:

Any person who shall intentionally (I) burn any child, (ii) torture any child or, (iii) except in self-defense or in order to prevent bodily harm to a third party, whip, strike or otherwise abuse or mutilate any child in such a manner as to cause serious bodily harm, shall be guilty of felonious abuse of a child . . . .

*Id.* (alteration in original) (quoting Miss. Code Ann. § 97-5-39(2)(a)). While the ***Rubenstein*** Court was only concerned with Section 97-5-39(2)(a) and did not analyze section 97-5-39(2)(c)(iii), we now hold that Section 97-5-39(2)(c)(iii), which contains the same "otherwise abuse" language as Section 97-5-39(2)(a), is also not unconstitutionally vague. The language in Section 97-5-39(2)(a) connects both the action "otherwise abuse" with "in such a manner as to cause serious bodily harm . . . ." *Id.* Likewise, the language in Section 97-5-39(2)(c)(iii) requires "serious bodily harm to any child" to occur and that the defendant "intentionally, knowingly or recklessly . . . otherwise abuse any child[.]"

¶38.    Section 97-5-39(f) defines "serious bodily harm" for the purposes of section 97-5-39(2) as

any serious bodily injury to a child and includes, but is not limited to, the fracture of a bone, permanent disfigurement, permanent scarring, or any internal bleeding or internal trauma to any organ, any brain damage, any injury to the eye or ear of a child or other vital organ, and impairment of any bodily function.

Miss. Code Ann. § 97-5-39(f) (Rev. 2014) (internal quotation marks omitted). Paragraph (g) further clarifies that nothing in paragraph (c) "shall preclude a parent or guardian from disciplining a child of that parent or guardian, or shall preclude a person in loco parentis to a child form disciplining that child . . . ." Miss. Code Ann. § 97-5-39(2)(g) (Rev. 2014).

¶39.    Pointing to examples such as spanking, Clark asserts that ordinary people will differ on what actions constitute abuse of a child. We disagree. When viewed together, the

20

element of serious bodily harm in Section 97-5-39(2)(c)(iii), along with the clarification in Section 97-5-39(2)(g) that discipline of a child is not precluded under paragraph (c), negates any concern that ordinary people would differ with regard to what actions constitute abuse of a child. In other words, we are unpersuaded that "a person of ordinary intelligence" would lack "a reasonable opportunity to know what conduct is prohibited" when section 97-5-39(2)(c)(iii) requires serious bodily harm and section 97-5-39(2)(g) carves out acts of discipline from the same offense. *Faraga*, 514 So. 2d at 303 (citing *Cumbest*, 456 So. 2d 209); *c.f. Wolfe v. State*, 743 So. 2d 380, 385 (Miss. 1999) ("As long as the discipline is moderate and reasonable in light of the age and condition of the child, and other surrounding circumstances, the parent or custodian will not incur criminal liability [for felony child abuse].").Thus, we find Clark's second additional assignment of error without merit.

> C. *Whether the circuit court erroneously instructed the jury on the lesser nonincluded offense of depraved-heart murder when Clark did not request such an instruction and whether, as a result, the circuit court violated Clark's rights per the Sixth and Fourteenth Amendment and Mississippi Constitution article 3, section 26.*

¶40. Again, Clark was convicted of depraved-heart murder under Mississippi Code Section 97-3-19(1)(b). Count I of Clark's indictment reads, in pertinent part:

> That [Joshua Eric Hawk Clark] . . . in said County and State between the 25th day of October, A.D., 2007 and the 6th day of January, 2008, did wilfully, unlawfully and feloniously with or without malice aforethought or deliberate design kill and murder Kiley Clark, a human being, having a date of birth of September 15, 2007, by violently shaking the child, causing rib fractures and other internal injuries resulting in the death of Kiley [sic] Clark, while he the said [Joshua Eric Hawk Clark] was engaged in the crime of Felony Child Abuse, all in violation of Mississippi Code, Annotated, Sections 97-3-19(2)(f) and 97-5-39(2)(a)[.]

21

¶41. Section 97-3-19(2) is Mississippi's capital murder statute. *See* Miss. Code Ann. § 97-3-19(2) (Rev. 2014). Clark argues that Count I failed to allege that Clark acted with a depraved heart and that the indictment instead implies that whether Clark acted with a depraved heart is irrelevant. Section 97-3-19(1)(b) provides that

> (1) The killing of a human being without the authority of law by any means or in any manner shall be murder in the following cases:
>
> . . . .
>
> (b) When done in the commission of an act eminently dangerous to others and evincing a depraved heart, regardless of human life, although without any premeditated design to effect the death of any particular individual, shall be second-degree murder[.]

Miss. Code Ann. § 97-3-19(1)(b) (Rev. 2014).

¶42. According to Clark, his rights under the Sixth and Fourteenth Amendments, as well as article 3, section 26, of the Mississippi Constitution, were violated since the jury was allowed to convict him via a depraved-heart-murder theory when he was not afforded notice of the nature and cause of the State's accusation. Further, citing ***Gause v. State***, 65 So. 3d 295, 300 (Miss. 2011), *abrogated on other grounds by **Hall v. State***, 127 So. 3d 202, 207 (Miss. 2013), Clark argues that a lesser, non included offense may not be given as an instruction absent a request for the same from the defendant. Finally, pointing to ***Johnson v. State***, 52 So. 3d 384, 397 (Miss. Ct. App. 2009), Clark argues that no evidence of malice, wanton recklessness or depraved heart was presented. In response, citing ***Wheeler v. State***, 536 So. 2d 1341, 1344 (Miss. 1988), the State argues that Section 97-3-19 "implicitly recognizes the established doctrine that simple murder is a lesser included offense of capital murder."

¶43. Clark's reliance on *Gause* and *Johnson* is misplaced. In *Gause*, we held that "burglary is not a lesser-included offense of capital murder, and because the State was not entitled to a lesser-offense instruction[,]" the "trial court clearly erred by granting the State's request for an instruction on burglary[.]" *Gause*, 65 So. 3d at 302. In *Johnson*, the Court of Appeals, recognizing that "manslaughter is a lesser offense of murder[,]" determined that there was insufficient evidence to support Johnson's conviction for depraved-heart murder. *Gause*, 65 So. 3d at 397 (citing *McCune v. State*, 989 So. 2d 310, 316 n.13 (Miss. 2008)).

¶44. We have held that "[a]s a matter of common sense, every murder done with deliberate design to effect the death of another human being is by definition done in the commission of an act imminently dangerous to others and evincing a depraved heart, regardless of human life." *Schuck v. State*, 865 So. 2d 1111, 1119 (Miss. 2003), *disagreed with by Dilworth v. State*, 909 So. 2d 731, 735 n.4 (Miss. 2005)[6]; *see Mallett v. State*, 606 So. 2d 1092, 1095 (Miss. 1992) ("[E]very murder done with deliberate design to effect the death of another human being is by definition done in the commission of an act imminently dangerous to others and evincing a depraved heart, regardless of human life."); *see also White v. State*, 964 So. 2d 1181, 1187 (Miss. Ct. App. 2007) ("Although the statutory language defining depraved heart murder does not clearly state the requirement for deliberate design or malice aforethought, depraved heart murder involves an act so reckless that malice or deliberate design is implied." (internal quotation marks omitted) (quoting *Chatman v. State*, 952 So.

---

[6] In *Dilworth*, we disagreed with *Schuck* and other precedent regarding "standard of review for sufficiency and weight of the evidence"—positions that "we retreated from" in *Bush v. State*, 895 So. 2d 836, 844 n.3 (Miss. 2005), *abrogated on other grounds by Little v. State*, 233 So. 3d 288, 292 (Miss. 2017). *Dilworth*, 909 So. 2d at 735 n.4.

2d 945, 948 (Miss. Ct. App. 2006))). Therefore, we find Clark's argument—that depraved-heart murder is a lesser, rather than a lesser-included, offense of capital murder—is without merit and that the circuit court did not err by providing a depraved-heart-murder instruction.

¶45. As to Clark's argument that he did not receive notice of a criminal charge for depraved-heart murder, Mississippi Code Section 97-3-19(3) provides that "[a]n indictment for murder or capital murder shall serve as notice to the defendant that the indictment may include any and all lesser included offenses thereof, including, but not limited to, manslaughter." Miss. Code Ann. § 97-3-19(3) (Rev. 2014). Count I of Clark's indictment alleging that he "did wilfully, unlawfully and feloniously with or without malice aforethought or deliberate design kill and murder Kiley [sic] Clark"[7] while engaged in the crime of felony child abuse clearly served as notice under Mississippi Code Section 97-3-19(3) that his indictment would include any and all lesser-included offenses, including depraved-heart murder. Therefore, we find Clark's third additional assignment of error without merit.

> D.   *Whether, by refusing to separate the trial into a guilt phase and a penalty phase so that jurors opposed to the death penalty could sit at the guilt phase, the circuit court violated Clark's Sixth and Fourteenth Amendment rights to a fair cross section of the community on the jury.*

¶46. Clark further asserts that his Sixth and Fourteenth Amendment rights were violated when eight jurors that expressed opposition to the death penalty were struck from the jury. Additionally, Clark argues that by excluding otherwise qualified jurors that were opposed to

---

[7] *See **Hawkins v. State**,* 101 So. 3d 638, 642 (Miss. 2012), (general discussion about how "depraved heart murder 'subsumes' deliberate design murder . . . ." (quoting ***Ruttley v. State***, 746 So. 2d 872, 879 (Miss. Ct. App. 1998))).

the death penalty, the State denied Clark a fair and impartial jury and effectively benefitted from extra peremptory challenges. Citing Mississippi Code Section 99-19-101(3), Clark argues that killing through child abuse cannot be considered an aggravating factor since all persons convicted of capital murder through child abuse are guilty of capital murder. *See* Miss. Code Ann. § 99-19-101(3) (Rev. 2015) ("For the jury to impose a sentence of death, it must unanimously find in writing the following: . . . (b) That sufficient aggravating circumstances exist as enumerated in subsection (5) of this section; and (c) That there are insufficient mitigating circumstances, as enumerated in subsection (6), to outweigh the aggravating circumstances.").

¶47. Specifically, Clark asserts that there were abundant mitigating factors and only one aggravating circumstance—that Kyllie was killed during the course of child abuse. And according to Clark, the fact that death occurred through child abuse does not narrow the class of eligible persons for the death penalty. Thus, Clark contends there was no need for a second jury since no aggravating factors existed and the mitigating factors were overwhelming. Clark cites two United States Supreme Court cases for the proposition that, notwithstanding the language of Mississippi Code Sections 99-19-101(3) and 99-19-101(5)(d), the fact that a killing occurred during the commission of felonious child abuse may not be constitutionally considered since such a fact does not "narrow the class" of persons eligible for the death penalty.

¶48. First, Clark points to ***McClesky v. Kemp***, 481 U.S. 279, 303-04, 107 S. Ct. 1756, 95 L. Ed. 2d 262 (1987) (footnote omitted) (citations omitted), in which the Court held that "a State must 'narrow the class of murderers subject to capital punishment,' . . . by providing

25

'specific and detailed guidance' to the sentencer.'" Second, and in further support of his argument that felonious child abuse may not constitutionally be used as an aggravating factor, Clark cites *Arave v. Creech*, 507 U.S. 463, 474, 113 S. Ct. 1534, 1542, 123 L. Ed. 2d 188 (1993). There, the Court held that "a State's capital sentencing scheme . . . must 'genuinely narrow the class of persons eligible for the death penalty.'" *Id.* (quoting *Zant v. Stephens*, 462 U.S. 862, 877, 103 S. Ct. 2733, 2742, 77 L. Ed. 2d 235 (1983)). Further, the Court recognized that "[w]hen the purpose of statutory aggravating circumstance is to enable the sentencer to distinguish those who deserve capital punishment from those who do not, the circumstance must provide a principled basis for doing so." *Id.* (citing *Lewis v. Jeffers*, 497 U.S. 764, 776, 110 S. Ct. 3092, 111 L. Ed. 2d 606 (1990)).

¶49.    We have resolved this issue. In *Galloway v. State*, 122 So. 3d 614, 680 (Miss. 2013) (citing *Thorson v. State*, 895 So. 2d 85, 105 (Miss. 2004)), we recognized that "the felony-murder aggravator genuinely narrows the class of defendants eligible for the death penalty." In doing so, we reasoned that "[n]ot every defendant eligible for the death penalty will have committed murder while in the course of sexual battery *or the other statutorily enumerated felonies*." *Id.* (emphasis added) (citing Miss. Code Ann. 97-3-19 (Rev. 2006)); *see, e.g. Loden v. Epps*, No. 1:10CV311-NBB, 2013 WL 5243670, at *49 (N.D. Miss. Sept. 18, 2013) ("The Mississippi statute narrows the class of capital defendants who are eligible for the death penalty by its definition of capital murder, *see* Miss. Code Ann. § 97-3-19(2), and through the use of aggravating circumstances." (citing Miss. Code Ann. § 99-19-101)), *aff'd sub nom. Loden v. McCarty*, 778 F.3d 484 (5th Cir. 2015). Indeed, we recognized in *Galloway* the United States Supreme Court's stance on aggravating circumstances as they

26

relate to a sentencing phase. *Galloway*, 122 So. 3d at 680 (citing *Lowenfield v. Phelps*, 484 U.S. 231, 246, 108 S. Ct. 546, 98 L. Ed. 2d 568 (1988)).

¶50. In *Lowenfield*, the Court, while assessing Louisiana's capital murder scheme, provided that "the fact that the aggravating circumstance duplicated one of the elements of the crime does not make this sentence constitutionally infirm." *Lowenfield*, 484 U.S. at 246. Here, just as in *Lowenfield*, the Mississippi "scheme narrows the class of death-eligible murderers and then at the sentencing phase allows for the consideration of mitigating circumstances and the exercise of discretion." *Id.* "The Constitution requires no more." *Id.*

¶51. Additionally, Clark acknowledges that, under Mississippi Code Section 99-19-101(5)(d), "felonious abuse . . . of a child" is an aggravating factor for the purposes of section 99-19-101(3) sufficient to justify a jury's imposition of the death penalty. Miss. Code Ann. § 99-19-101(3) (Supp. 2019). We have recognized that "[f]elonious child abuse is an underlying felony, *as well as an aggravator*, in Mississippi's capital-sentencing scheme." *Moffett v. State*, 156 So. 3d 835, 863 (Miss. 2014) (emphasis added) (citing Miss. Code Ann. §§ 99-3-19(2)(f), 99-19-105(5)(d) (Rev. 2007)). Moreover, "evidence of an underlying crime can properly be used both to elevate the crime to capital murder and as an aggravating circumstance." *Id.* at 864 (internal quotation mark omitted) (quoting *Ross v. State*, 954 So. 2d 968, 1014 (Miss. 2007)). And "[t]he United States Supreme Court has held that the use of an underlying felony as an aggravator is not a constitutional error." *Id.* (citing *Tuilaepa v. California*, 512 U.S. 967, 971-72, 114 S. Ct. 2630, 129 L. Ed. 2d 750 (1994)). Thus, Clark's constitutional attack regarding felonious child abuse's use as both an aggravator in sentencing and an element to elevate a homicide to capital murder is without merit.

27

¶52.    Next, citing ***Duren v. Missouri***, 439 U.S. 357, 364, 99 S. Ct. 664, 58 L. Ed. 2d 579 (1979), Clark argues that the exclusion of a distinctive group—here potential jurors who expressed opposition to the death penalty—in the community violates the fair-cross-section requirement of the Sixth and Fourteenth Amendments.  We have recognized that ***Duren*** provides the test for a prima facie violation of the fair-cross-section requirement of the Sixth Amendment.  ***Yarbrough v. State***, 911 So. 2d 951, 954 (Miss. 2005).  To succeed on this assignment of error, Clark would need to show

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion fo the group in the jury selection process.

***Id.*** at 955 (citing ***Duren***, 439 U.S. at 364).

¶53.    We have previously addressed the veracity of an argument similar to Clark's argument here.  In ***Wilcher v. State***, 863 So. 2d 719, 767 (Miss. 2003) (citations omitted) quoting ***Jordan v. State***, 786 So. 2d 987, 1028-29 (Miss. 2001)), we reiterated that

> a prospective juror's views on the death penalty do not make one a member of a distinctive class protected by ***Batson v. Kentucky***, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), and its progeny. . . . [E]xcusing all jurors who have conscientious scruples against the death penalty does not deny a defendant his right to a representative cross-section of the community.

In ***Wilcher***, we also recognized that excluding jurors who express an inability to impose the death penalty does not equate to a fair-cross-section violation since the same jurors do not "constitute a distinctive group for fair cross section purposes." ***Id.*** at 768 (quoting ***Buchanan v. Kentucky***, 483 U.S. 402, 415, 107 S. Ct. 2906, 97 L. Ed. 2d 336 (1987)); ***Lockhart v. McCree***, 476 U.S. 162, 177, 106 S. Ct. 1758, 1767, 90 L. Ed. 2d 137 (1986) ("[W]e conclude

28

that '**Witherspoon**-excludables' do not constitute a 'distinctive group' for fair-cross-section purposes, and hold that 'death qualification' does not violate the fair-cross-section requirement."[8]).

¶54.    Thus, Clark has failed to establish that his Sixth and Fourteenth Amendment rights to a fair cross section were violated by the exclusion of jurors opposed to the death penalty since he is unable to show that jurors opposed to the death penalty constitute a "distinctive group" for fair-cross-section purposes.  Since jurors opposed to the death penalty do not constitute a "distinctive group," we decline to address the remaining two requirements for a fair-cross-section violation.  Therefore, Clark's fourth additional assignment of error is without merit.

> E.    *Whether the circuit court erred by excluding relevant defense evidence and permitting irrelevant prosecution evidence and whether such errors denied Clark a fair trial in violation of the Fourteenth Amendment.*

¶55.    Clark argues that the circuit court erred in three evidentiary rulings with each error constituting a denial of a fair trial and a violation of Clark's Sixth and Fourteenth Amendment rights.  Each alleged error is addressed in turn below.

> i.    Whether the circuit court permitted irrelevant, highly prejudicial evidence regarding compensation of Clark's expert witness, Dr. Shuman.

¶56.    In closing argument, the State commented on Clark's failure to subpoena the doctor

---

[8] "**Witherspoon**-excludables" are "those prospective jurors who state[] that they could not under any circumstances vote for the imposition of the death penalty . . . ." **Lockhart**, 476 U.S. at 162 (citing **Witherspoon v. Illinois**, 391 U.S. 510, 88 S. Ct. 1770, 20 L. Ed. 2d 776 (1968)).

that performed the autopsy on Kyllie Clark. Further, the State argued, with respect to Clark's expert witness, Dr. Shuman, that "[t]hey had rather have a hired gun come in here from Florida, you pay him $10,000, he'll get up there and tell you anything you want to hear. Dr. Lakin gets paid nothing." The State also commented on Dr. Shuman's compensation with the following statement: "[i]f you pay some expert $8500 to come up here for an hour's testimony, they'll say it."

¶57.    Clark argues that the circuit court permitted irrelevant, highly prejudicial evidence regarding compensation for Dr. Shuman's expert testimony. The State argues that any such abuse must cause prejudice and harm and that Clark has failed to demonstrate the same and that evidence of witness bias is admissible under Mississippi Rule of Evidence 616 to attack credibility.

¶58.    Rule 616 provides that "[e]vidence of a witness's bias, prejudice, or interest—for or against any party—is admissible to attack the witness's credibility." MRE 616. And "[i]n general, evidence of an expert witness's possible financial economic bias is relevant and admissible." ***Wright v. Turan-Foley Motors, Inc.***, 269 So. 3d 160, 168 (Miss. Ct. App. 2018). Thus, the trial court did not err by allowing the State to discuss financial compensation for Dr. Shuman's testimony in closing arguments to show Dr. Shuman's potential economically motivated bias.

¶59.    Clark argues in the alternative that any probative value in testimony concerning Dr. Shuman's compensation was far outweighed by its prejudicial effect and, therefore, was inadmissible under Rule 403 of the Mississippi Rules of Evidence. Rule 403 provides that

> The court may exclude relevant evidence if its probative value is substantially

30

outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

MRE 403.

¶60. "The trial court generally is allowed wide discretion concerning the admission of evidence offered to suggest bias on the part of a witness against the defendant." *Ambrose v. State*, 254 So. 3d 77, 100 (Miss. 2018) (citing *Tillis v. State*, 661 So. 2d 1139, 1142 (Miss. 1995)). Further, "[w]e will affirm the trial court's exercise of discretion unless the ruling resulted in prejudice to the accused." *Id.* (internal quotation marks omitted) (quoting *Anthony v. State*, 108 So. 3d 394, 397 (Miss. 2013)).

¶61. The Court of Appeals' decision in *Dao v. State*, 984 So. 2d 352, 360-61 (Miss. Ct. App. 2007), is instructive. There, the trial judge did not say that he "found the evidence more probative than prejudicial." *Id.* at 361. Even so, the trial court in *Dao* "heard arguments from both parties regarding the admissibility of the evidence prior to reaching the conclusion that it should be admitted for the limited purpose of showing bias." *Id.* Likewise, we have recognized that a trial court may implicitly weigh undue prejudice against probative value even when a trial court does not use "magic words" regarding the danger of unfair prejudice and probative value of evidence but ultimately rules on admissibility after hearing arguments from both parties. *Hoops v. State*, 681 So. 2d 521, 531 (Miss. 1996) (internal quotation marks omitted), *abrogated on other grounds by Willis v. State*, 300 So. 3d 999, 1009 n. 2 (Miss. 2020).

¶62. Here, Clark filed a motion in limine, as well as a renewed motion in limine, seeking to prohibit questions regarding expert-witness compensation. The Court denied Clark's

motion in limine after hearing argument from Clark and the State on the issue. Additionally, and following the State's inference during closing argument of paying a "hired gun" $10,000 to say "anything you want to hear[,]" Clark's counsel objected: "[o]bjection. That statement is not support by the evidence." The State responded: "[t]his is argument and all reasonable inferences." It is clear from the record that the circuit court ruled on admissibility after hearing argument from both parties not only following the court's ruling on Clark's motion in limine but also following Clark's objection during the State's closing argument. We therefore find that the circuit court did not err, because it implicitly weighed the probative value of evidence regarding Dr. Shuman's expert witness compensation and any undue prejudice that would result from admission. *Dao*, 984 So. 2d at 361; *see Hoops*, 681 So. 2d at 531.

> ii.    Whether the trial court improperly denied
> Clark the opportunity to cross-examine Dr. Lakin
> to show bias.

¶63.    Citing *United States v. Mayer*, 556 F.2d 245, 250 (5th Cir. 1977),[9] Clark also argues that the trial court improperly disallowed impeachment evidence of Dr. Lakin in violation of his Sixth Amendment Confrontation Clause rights. Specifically, Clark attempted to elicit testimony regarding Dr. Lakin's personal divorce and certain facts about Dr. Lakin's child, including bed-wetting and appointment of a guardian ad litem. According to Clark, this information would show Dr. Lakin's bias toward persons accused of child abuse. Clark's counsel, during cross-examination of Dr. Lakin, specifically asked questions regarding the

---

[9]In that case, the United States Court of Appeals for the Fifth Circuit held that a trial judge frustrated Mayer's full exercise of his Sixth Amendment rights by not allowing sufficient inquiry into the prosecution witness' motivation to testify. *Id.*

appointment of a guardian ad litem and a psychologist for her two children. Following an objection from the State, the court sent the jury out of the courtroom.

¶64. Outside of the presence of the jury, counsel for Clark argued that the appointment of a guardian ad litem following report of a bed-wetting issue with one of her children showed that "[Dr. Lakin] has a personal reason to bias her testimony in this case" "if she was involved in that process[.]" The trial court responded:

> You are attacking her – or at least revealing things that has got not one thing to do with this. The objection of the State will be sustained. You can make a proffer right now of whatever. I don't know. You're not going to ask her anymore questions. Just tell us what you think she will say.

In response to the trial court's invitation for a proffer, Clark's counsel requested the guardian ad litem order be marked for identification, and it was marked Defendant's Exhibit No. 7. Then, Clark's counsel stated that "[m]y presentation would be basically that this would relate to her bias as opposed to medical that's outside the medical context."

¶65. The trial court concluded by discussing the scope of permissible cross-examination:

> The Court:  Now, everything – everything about the medical aspects of this, what she knows about this case is fair game.
>
> Mr. Webb:  Yes, sir.
>
> The Court:  Her qualifications and whatever. But I know of nothing that suggests what you're trying to get at. You can ask her, if you'd like, if she's biased, opinionated, prejudiced, or such thing in favor of child abuse –
>
> Mr. Webb:  Well, Your Honor –
>
> The Court:  – as a diagnosis.

While still outside the presence of the jury, Clark's counsel then asked Dr. Lakin if she was

biased, to which she responded, "[o]f course I'm not biased."

¶66.    "Defendants in criminal cases have a fundamental constitutional right to be confronted with the witnesses against them." *Hutto v. State*, 227 So. 3d 963, 983 (Miss. 2017) (internal quotation marks omitted) (quoting *Armstead v. State*, 196 So. 3d 913, 917 (Miss. 2016)). "And '[t]he right of a criminal defendant . . . to cross examine witnesses against him is at the heart of the [C]onfrontation [C]lause.'" *Id.* (alterations in original) (quoting *Armstead*, 196 So. 3d at 917). This right of confrontation extends to the full cross-examination of witnesses "on every material point relating to the issue to be determined that would have a bearing on the credibility of the witness and the weight and worth of his testimony." *Id.* (internal quotation mark omitted) (quoting *Scott v. State*, 796 So. 2d 959, 964 (Miss. 2001)). Moreover, "Mississippi allows wide-open cross-examination of any matter that is *relevant*, including the possible interest, bias, or prejudice of the witness." *Anthony v. State*, 108 So. 3d 394, 397 (Miss. 2013) (emphasis added) (citing *Meeks v. State*, 604 So. 2d 748, 755 (Miss. 1992)).

¶67.    But "[t]he trial court generally is allowed wide discretion concerning the admission of evidence offered to suggest bias on the part of a witness against the defendant." *Ambrose*, 254 So. 3d at 100 (citing *Tillis*, 661 So. 2d at 1142). Further, "[w]e will affirm the trial court's exercise of discretion unless the ruling resulted in prejudice to the accused." *Id.* (internal quotation marks omitted) (quoting *Anthony*, 108 So. 3d at 397). And

> "[W]hile the [United States] Constitution thus prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of

34

the issues, or potential to mislead the jury."

*Id.* at 100-01 (quoting *Holmes v. South Carolina*, 547 U.S. 319, 326-27, 126 S. Ct. 1727, 164 L. Ed. 2d 503 (2006)).

¶68.   Further, "Rule 616 must be interpreted as it relates to other rules of evidence, particularly [Rules] 104, 401 and 402." *Id.* at 101 (internal quotation marks omitted) (quoting *Tillis*, 661 So. 2d at 1142).   Rule 402 provides, in part, that "[i]rrelevant evidence is not admissible."   MRE 402.   Rule 401 provides that "[e]vidence is relevant if: **(a)** it has any tendency to make a fact more or less probable than it would be without the evidence; and **(b)** the fact is of consequence in determining the case."  MRE 401.   Once again, the circuit court, after halting defense counsel's questioning of Dr. Lakin regarding her divorce, her child's bed-wetting and appointment of a guardian ad litem for her child, stated that "[y]ou are attacking her – or at least revealing things that has got not one thing to do with this."

¶69.   While the circuit court did not perform an explicit Rule 401 relevancy test or a Rule 403 balancing test, after reviewing the record we find that the circuit court did not abuse its discretion by prohibiting Clark's counsel's questioning on cross-examination regarding Dr. Lakin's personal divorce and matters related to her children, as the same evidence was irrelevant per Rule 401 and, therefore, inadmissible under Rule 402.   Indeed, the circuit court appears to analyze the relevancy of Clark's proffer: "[y]ou are . . . at least revealing things that has got not one thing to do with this."   While not using the specific language of Rule 401, we find that the circuit court considered whether the evidence regarding Dr. Lakin's divorce and children had any tendency to make a fact of consequence in Clark's case more or less probable than they would have been without the same evidence.  *See* MRE 401.

35

¶70. Furthermore, the circuit judge "was present when the examination transpired and he was in the best position to rule on its exclusion." **Wortham v. State**, 883 So. 2d 599, 607 (Miss. Ct. App. 2004). The circuit court also allowed Clark to ask Dr. Lakin directly whether she was biased in favor of a child abuse diagnosis. Dr. Lakin responded in the negative. We therefore find that Clark was not prejudiced by the circuit court's exclusion of evidence concerning Dr. Lakin's personal experiences with divorce or matters involving her children. Even if the circuit court abused its discretion in excluding otherwise relevant evidence that would have passed muster under a Rule 403 balancing test, Clark was still provided the opportunity to elicit testimony from Dr. Lakin that specifically dealt with any alleged bias in favor of child abuse diagnoses. To warrant reversal, "the admission or exclusion of evidence must result in prejudice or harm . . . ." **Ellis v. State**, 856 So. 2d 561, 565 (Miss. Ct. App. 2003) (quoting **Jackson v. State**, 594 So. 2d 20, 25 (Miss. 1992)). Thus, we find this assignment of error to be without merit.

> iii.   Whether the circuit court erroneously denied Clark's request to introduce evidence of Bethany Clark's drug-related felony conviction.

¶71. Clark additionally argues that the trial court erred by disallowing testimony of Bethany Clark's prior drug conviction in violation of Mississippi Rule of Evidence 609(a). Outside the presence of the jury, the trial court addressed the State's motion in limine seeking to exclude evidence of Bethany Clark's drug-related felony conviction. The trial court acknowledged that the State attempted to exclude evidence of the conviction for a non party witness, making note of Mississippi Rule of Evidence 609. The State then responded that the time between Kyllie Clark's death and Bethany Clark's drug conviction made such

evidence "absolutely collateral and irrelevant to the facts . . . ."

¶72. After recognizing that "this is evidence intended to attach the character, truthfulness, and so forth of the witness by demonstrating she's been convicted of a felony sometime after all of this took place and was done[,]" the trial court, citing Rule 403, went on to determine that evidence of Bethany Clark's conviction "has little probative value." Further, the court reasoned that "there will be adequate testimony to indicate [Bethany Clark's] drug use . . ." and decided to exclude the conviction evidence.

¶73. Rule 609(a) provides, in pertinent part, the following:

**(a)** **In General.** The following rules apply to attacking a witness's character for truthfulness by evidence of a criminal conviction:

**(1)** for a crime that, in the convicting jurisdiction, was punishable by death or by imprisonment for more than one year, the evidence:

**(A)** must be admitted, subject to Rule 403, when the witness is not a party;

MRE 609(a). And again, Rule 403 provides that

The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

MRE 403.

¶74. While Bethany Clark is certainly a nonparty and Clark attempted to introduce evidence of a felony conviction to attack Bethany Clark's character for truthfulness, Clark overlooks the requirement for a Rule 403 analysis contained in Rule 609(a)(1)(A). As discussed above, the trial court performed a Rule 403 balancing test and determined that

37

evidence of Bethany Clark's subsequent conviction held little probative value.

¶75. "[T]he standard of review regarding Rule 403 determinations is an "abuse of discretion."" *Fitch v. Valentine*, 959 So. 2d 1012, 1022 (Miss. 2007) (alteration in original) (internal quotation mark omitted) (quoting *Baldwin v. State*, 784 So. 2d 148, 160 (Miss. 2001)). Further, "[w]here a trial court determines that potentially prejudicial evidence possesses sufficient probative value, it is within that court's sound discretion whether or not to admit the same, since [Rule] 403 does not mandate exclusion but rather provides that the evidence *may* be excluded." *Jones v. State*, 904 So. 2d 149, 152 (citing *Baldwin*, 784 So. 2d at 156). And "[t]he task of an appellate court in reviewing such a determination is not to conduct its own de novo Rule 403 balancing, but simply [to] determine whether the trial court abused its discretion in weighing the factors and in admitting or excluding the evidence." *Id.* (citing *Foster v. State*, 508 So. 2d 1111, 1117-18 (Miss. 1987), *overruled on other grounds by Powell v. State*, 806 So. 2d 1069, 1080 (Miss. 2001)).

¶76. We agree with the trial court's analysis that, under Rule 403, evidence of Bethany Clark's subsequent drug conviction held little, if any, probative value. Further, even assuming that the trial court did abuse its discretion by excluding evidence of Bethany Clark's felony drug conviction, we hold that any such error was harmless. "[F]or a case to be reversed on the admission or exclusion of evidence, it must result in prejudice and harm or adversely affect a substantial right of a party." *Hammons v. State*, 918 So. 2d 62, 65 (alteration in original) (internal quotation mark omitted) (quoting *Holladay v. Holladay*, 776 So. 2d 662, 672 (Miss. 2000)). And "[e]rror is reversible only where it is of such magnitude as to leave no doubt that the appellant was unduly prejudiced." *Id.* (internal quotation mark

omitted) (quoting *Holladay*, 776 So. 2d at 672). Moreover, "[t]he Constitution does not guarantee a perfect trial, but it does entitle a defendant in a criminal case to a fair trial." *Id.* (citing *Clark v. State*, 891 So. 2d 136, 141 (Miss. 2004)). When a trial court improperly restricts a defendant's ability to impeach a witness, certain factors may be examined to determine whether the error was harmless, including "the extent of cross-examination otherwise permitted . . . ." *Id.* (internal quotation mark omitted) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986)).

¶77.    Here, testimony regarding Bethany Clark's illegal drug use was presented to the jury. Indeed, after excluding evidence of Bethany Clark's conviction, the trial judge stated that "I think it's fair game for you to inquire about what happened at or about the time of this incident." During cross-examination of Bethany Clark by defense counsel, Bethany Clark admitted to having "used street drugs" "[b]efore the pregnancy . . . ." It is apparent that the extent of cross-examination permitted by the trial court renders any potential error in excluding evidence of Bethany Clark's conviction harmless.

¶78.    Indeed, "[h]armless error will result if the same evidence improperly excluded comes in by another means." *Holland v. State*, 705 So. 2d 307, 344 (Miss. 1997) (citing *Jackson v. State*, 594 So. 2d 20, 25 (Miss. 1992)). Since evidence of Bethany Clark's drug use before and after Kyllie Clark's death "[came] in by another means, [any potential] exclusion error is rendered harmless." *Wilson v. State*, 156 So. 3d 808, 810 (Miss. 2013) (citing *Holland*, 705 So. 2d at 307). Therefore, notwithstanding our holding that the circuit court did not abuse its discretion by excluding evidence following a Rule 403 test of Bethany Clark's felony drug conviction subsequent to Kyllie Clark's death, we find that any potential error

39

was rendered harmless by both the extent of cross-examination by Clark and the presentation of evidence of Bethany Clark's drug use.

> ### F. Whether the admission of the medical report of nurse practitioner Ashley Weiderhold violated Clark's confrontation rights under the Sixth Amendment.

¶79. Finally, Clark argues that his rights under the Confrontation Clause of the Sixth Amendment were violated when Ashley Weiderhold, a nurse practitioner who dictated Dr. Lakin's report upon which Dr. Lakin relied for her own testimony at trial, was not present at trial for cross-examination by Clark. Clark asserts that Dr. Lakin simply reviewed, opened, closed and signed the report. Clark submits that the inability to cross-examine Weiderhold required reversal of his conviction. The State instead argues that Clark's Sixth Amendment Confrontation Clause rights were satisfied when Dr. Lakin reviewed the report for accuracy and signed it as a technical reviewer.

¶80. "Defendants in criminal cases have a fundamental constitutional right to be confronted with witnesses against them." *Armstead*, 196 So. 3d at 917 (citing U.S. Const. amend. VI; Miss. Const. art. 3, § 26). Per *Melendez-Diaz v. Massachusetts*, 577 U.S. 305, 310-11, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009), and *Bullcoming v. New Mexico*, 564 U.S. 647, 664-665, 131 S. Ct. 2705, 180 L. Ed. 2d 610 (2011), "forensic reports created specifically to serve as evidence against an accused at trial are among the 'core class of testimonial statements' governed by the Confrontation Clause." *Armstead*, 196 So. 3d at 918. We have approved the admission of reports through the testimony of "technical reviewers, who had examined reports generated by other analysts and verified that the data supported the conclusions of the reports." *Id.* at 920 (citing *Jenkins v. State*, 102 So. 3d 1063, 1064, 1069 (Miss. 2012);

*Grim v. State*, 102 So. 3d 1073, 1074, 1081 (Miss. 2012)).

¶81. The case against finding a constitutional violation is even stronger here than in *Armstead* or *Grim*.[10] Rather than a technical reviewer simply reviewing the work of an analyst and signing off on a report, Dr. Lakin testified at trial—subject to Clark's cross-examination—regarding a report that Weiderhold dictated for Dr. Lakin and that Dr. Lakin later reviewed and signed. Simply stated, Clark's fundamental right to confront the witness against him was not violated by an inability to confront a party that dictated a medical report. Clark's assertion, that Weiderhold rather than Dr. Lakin wrote the report, is without merit and does not demonstrate a violation of Clark's rights under the Confrontation Clause.

¶82. Since the circuit court did not err by admitting the medical report dictated by Weiderhold that was reviewed and signed by Dr. Lakin and since Dr. Lakin was present at trial for cross-examination, Clark has failed to show that a constitutional violation occurred here. Accordingly, Clark's sixth and final remaining assignment of error is without merit.

## CONCLUSION

¶83. We reverse the decision of the Court of Appeals, and we reinstate and affirm the decision of the Itawamba County Circuit Court.

---

[10] *See Armstead*, 196 So. 3d at 920-21 (When an expert forensic science witness who served as a technical reviewer for tests performed on a substance suspected to be cocaine reviewed the data provided by the primary analyst and verified the primary analyst's conclusions and testified about her involvement in the testing procedures, we held that the expert witness's testimony "did not violate Armstead's rights under the Confrontation Clause."); *see also Grim*, 102 So. 3d at 1081 (When a testifying laboratory supervisor witness was not involved in the testing of a substance, but "reviewed the report for accuracy and signed the report as the 'case technical reviewer[,]'" we held that Grim's rights under the Sixth Amendment were satisfied because Grim was able to cross-examine the supervisor.).

¶84.   **THE JUDGMENT OF THE COURT OF APPEALS IS REVERSED.  THE JUDGMENT OF THE ITAWAMBA COUNTY CIRCUIT COURT IS REINSTATED AND AFFIRMED.**

**MAXWELL, BEAM AND GRIFFIS, JJ., CONCUR.  RANDOLPH, C.J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. ISHEE, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS AND KING, P.JJ., AND COLEMAN, J.**

**ISHEE, JUSTICE, DISSENTING:**

¶85.   "Battle of the experts" is a misnomer.  The State failed to establish that its expert was anything more than a qualified pediatrician. ***Daubert v. Merrell Dow Pharmaceuticals, Inc.***, 509 U.S. 597, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), requires the prosecution to show reliable methodology: that Dr. Lakin could reliably establish that Kyllie was injured in Clark's custody and that her injuries were caused by abusive head trauma.  The State failed to do so, and, as such, I must respectfully dissent.

¶86.   Justice Chamberlin emphasizes that this Court "must not allow ourselves to become the gatekeeper." Chamberlin Op. ¶ 13.  I too am "confident that our learned trial judges can and will properly assume the role as gatekeeper on questions of admissibility of expert testimony." ***Miss. Transp. Comm'n v. McLemore***, 863 So. 2d 31, 40 (Miss. 2003). ***Daubert*** endorses "trial-court discretion in choosing the manner of testing reliability." ***Kumho Tire Co. v. Carmichael***, 526 U.S. 137, 158, 119 S. Ct. 1167, 1179, 143 L. Ed. 2d 238 (1999) (Scalia, J., concurring).  But this discretion "is not discretion to abandon the gatekeeping function." ***Id.*** at 158-59.  "[I]t is not discretion to perform the function inadequately. Rather, it is discretion to choose among *reasonable* means of excluding expertise that is *fausse* and science that is junky." ***Id.*** at 159.  "This Court and the Mississippi Court of

Appeals have reversed and remanded cases in which the trial court erroneously included or excluded expert testimony." ***Inv'r Res. Servs. Inc. v. Cato***, 15 So. 3d 412, 416 (Miss. 2009). It is the duty of this Court to determine whether the trial court abused its discretion as the gatekeeper. ***Id.***

¶87. Here, the trial court held a ***Daubert*** hearing regarding the admissibility of Dr. Lakin's expert testimony. As an experienced pediatrician of almost twenty years and a board-certified child-abuse specialist, Dr. Lakin was qualified to render an expert opinion within the field of pediatrics. But an extensive voir dire of Dr. Lakin revealed that the methodology behind her opinion failed to meet the reliability prong.

¶88. The defense asked Dr. Lakin whether there was disagreement in the scientific community over SBS/AHT methodology. She conceded there was. When asked whether she could cite any specific scientific source to substantiate the methodology, she referred generally to the American Academy of Pediatrics. The defense asked Dr. Lakin if the field of pediatrics was the sole discipline to study SBS/AHT; she replied that it was not.

¶89. According to Dr. Lakin, physiologists, pathologists, radiologists, neurosurgeons, and engineers have also analyzed the theory. She acknowledged that many disciplines discount SBS/AHT as a reliable diagnosis. When the State asked Dr. Lakin her conclusion as to Kyllie's cause of death, she replied that despite a lack of external trauma to Kyllie and a lack of history of any type of trauma, Kyllie's internal hemorrhages as well as her rib fractures led Dr. Lakin to conclude SBS/AHT was the cause of death.

¶90. Dr. Lakin testified during the hearing that she could, to a degree of medical certainty, render an opinion as to the timing of Kyllie's injury. She opined that Kyllie's injury could

43

not have occurred before 3 p.m., meaning that Kyllie's injury must have occurred while she was in the sole custody of Clark. Dr. Lakin was extensively questioned regarding her degree of certainty as to the timing of the injury.

¶91. Dr. Lakin also opined that the more severe the neurological symptoms, the closer in time the injury must have occurred. She reasoned that because Kyllie's symptoms manifested themselves quickly, her injury took place within the precise window of 3 p.m. to 5:30 p.m., when Kyllie was in the care of Clark. Dr. Lakin's opinion was the only evidence establishing what happened to Kyllie and when it must have occurred. In order for Dr. Lakin's testimony to pass muster under *Daubert*, the State was required to show that her testimony reliably established when Kyllie was injured and connected that time with Clark's sole custody of Kyllie. *See* 509 U.S. at 589-90.

¶92. On cross-examination, the defense inquired as to the specific injuries that Dr. Lakin diagnosed. By her own account, Dr. Lakin could not connect Kyllie's rib fractures, which were healing, to January 5 and could certainly not say they were inflicted during the two-hour span that day in which Clark had sole custody of Kyllie. Clark further questioned Dr. Lakin about whether the numerous resuscitation attempts made on Kyllie could have impacted Kyllie's diagnosis. The pathologist's report listed "aggressive cardiopulmonary resuscitation" (CPR) as one of the injuries observed at the autopsy. Dr. Lakin admitted that several attempts were made to resuscitate Kyllie. When questioned about whether the CPR could have caused Kyllie's subdural hemorrhages, Dr. Lakin could not rule the possibility out.

¶93. The *Daubert* Court held that whether the underlying theory can be tested is the key

question in whether the methodology is reliable. ***Daubert***, 509 U.S. at 593. The defense asked if Dr. Lakin could state how much force was required to cause SBS/AHT:

> Q.     All right. So what studies do you have to talk about how the velocity with which a human being can shake a baby? What studies do you have about that?
>
> A.     Well, that's the problem. You can't do a study on what forces are generated when a baby is shaken because we can't shake a human baby and measure the force.
>
> Q.     So you can't say how much force it takes, then, to cause shaken baby syndrome?
>
> A.     That's correct.

¶94.     Dr. Lakin admitted that she could not state the amount of force required to cause Kyllie's injuries. At the ***Daubert*** hearing, when asked to produce any literature affirming the validity of SBS/AHT within the medical community, Dr. Lakin replied that she did not have any articles with her. Instead, she pointed generally to the position paper of American Academy of Pediatrics. Dr. Lakin admitted that she did not know of any studies regarding the error rate of SBS/AHT diagnosis. In fact, the State never offered any scientific literature to support Dr. Lakin's position. Clark, on the other hand, provided multiple articles, studies, and other sources criticizing the validity of SBS/AHT.

¶95.     Dr. Lakin admitted that a SBS/AHT diagnosis creates an assumption about the caregiver due to the lack of explanation for the infant's injuries. She also acknowledged that because she was not a pathologist, she did not have the training nor expertise to determine cause of death. Dr. Lakin testified that there is literature stating that the more severe the injury, the more likely it is for symptoms to immediately appear, but she could not name any

45

specific source.

¶96. Instead of determining whether Dr. Lakin's testimony was reliable, the circuit court erroneously found only that Dr. Lakin was in fact an expert. The record undeniably reflects Dr. Lakin's competence and expertise as a pediatrician and child-abuse treatment provider. But this is inadequate to support a conclusion that her methodology was reliable. It is the task of the trial court, not the jury, to determine whether proffered expert testimony is reliable.

¶97. Justice Chamberlin opines that "the real problem in this case" is "not so much the testimony of Dr. Lakin as it is the fact that the SBS/AHT diagnosis has been increasingly challenged and questioned in recent years." Chamberlin Op. ¶ 24. Certainly I am concerned about the validity of the science behind SBS/AHT, but the validity of SBS/AHT is not before the Court per se. The real problem is that Dr. Lakin did not establish the required reliability of her methodology as required by *Daubert*.

¶98. The trial court made only cursory findings as to the admissibility of Dr. Lakin's opinion testimony. In fact, the trial court's only finding regarding Dr. Lakin's testimony was that "she is qualified to testify." The trial court did not address the reliability or the relevance of Dr. Lakin's testimony. Justice Chamberlin hand waves that the trial court lumped the *Daubert* findings of relevance and reliability under the trial court's term "qualified." Chamberlin Op. ¶ 20. Justice Chamberlin is correct that there are no "magic words" required under *Daubert*, but there are still demands that must be met—namely, reliability. Chamberlin Op. ¶ 20 (citing *Jones v. State*, 920 So. 2d 465, 476 (Miss. 2006)). I would emphasize that the qualifications of the witness are not what establishes reliability under

*Daubert*. The trial judge as gatekeeper must determine if the witness's proffered methodology is reliable, not whether the expert herself is reliable. *See* 509 U.S. at 589-90.

¶99.   Dr. Lakin was given extensive opportunity to defend her proposed methodology, but she could not.  She could not cite or name any specific article supporting her methodology. Simply stating that peer-reviewed articles exist is not providing evidence of acceptance in the scientific community.  The defense expert on the other hand thoroughly discredited SBS/AHT by providing ample documentation criticizing the validity of the diagnosis.  If Dr. Lakin's position in support of SBS/AHT really is recognized by the scientific community as a viable alternative, Dr. Lakin failed to prove it.  The trial judge abused his discretion in admitting her testimony.

¶100.  Finally, I would echo the Court of Appeals in stating that

> Our reversal is not meant to serve as a determination that all scientific testimony regarding SBS is insufficiently reliable to serve as a basis for civil or criminal liability. Our reversal is instead intended to encourage the proponents of SBS testimony to solidly provide courts with true "expert" testimony grounded on sound methodology, principles, or techniques.

*Clark v. State*, No. 2017-KA-00411-COA, 2019 WL 5566234, at *1 n.1 (Miss. Ct. App. Oct. 29, 2020).  If the State had another bite at the apple, Dr. Lakin could very well establish that her opinion regarding SBS/AHT is reliable enough under *Daubert* to aid a jury.

¶101.  I would find that the Court of Appeals correctly held that the circuit court abused its discretion by admitting Dr. Lakin's testimony.  I respectfully dissent.

**KITCHENS AND KING, P.JJ., AND COLEMAN, J., JOIN THIS OPINION.**